**TXI TRANSPORTATION COMPANY, Ricardo Reyna Rodriguez, Aurelio Melendez, Appellants,**

v.

Randy HUGHES, Individually and as Personal Representative for the Estate of Shiloh Hughes; Clint Royse, Individually As Personal Representative for the Estate of Afton Hughes Royse and as Next Friend of Jagr Royse; Willie Watkins, Individually and as Personal Representative for the Estate of Joyce Watkins and as Personal Representative for the Estate of Kimberly Watkins Hughes; Shirley Richey; Carolyn Largent; Betty Gentry; and Johnny Watkins, Appellees.

No. 2–04–242–CV.

Court of Appeals of Texas, Fort Worth.

May 24, 2007.

Reagan W. Simpson, H. Victor Thomas, Amy C. Eikel, King & Spalding L.L.P., Charles W. Hurd, Fulbright & Jaworski L.L.P., Houston, Mark E. Stradley, Stradley & Wright, Michael C. Steindorf, Ben Taylor, Fulbright & Jaworski L.L.P., Christopher N. Forbis, Sewell & Forbis, Decatur, for Appellants.

Dee J. Kelly, Jr., Brian S. Stagner, Caj D. Boatright, Kelly, Hart & Hallman, P.C., Michael A. Simpson, Derrick Boyd, G. Alan Powers, Simpson, Boyd & Powers, P.L.L.C., Bridgeport, Fort Worth, for Appellees.

Panel B: LIVINGSTON, GARDNER and WALKER, JJ.

### OPINION

SUE WALKER, Justice.

#### I. Introduction

This is a wrongful death and survival action stemming from a collision on Highway 114 between a westbound Yukon driven by Kim Hughes and an eastbound gravel truck driven by Ricardo Rodriguez. The gravel truck was owned by Aurelio Melendez and leased to TXI Transporta-

tion Company. The passengers in the Yukon were Joyce Watkins (Kim's mother), Afton Hughes Royse (Kim's daughter who was pregnant with twins), Shiloh Hughes (Kim's son), and Jagr Royse (Kim's grandson). As a result of the Yukon's "sideswipe" collision with the gravel truck, the Yukon traveled down the length of the gravel truck, spun off the back of the gravel truck, veered into the oncoming lane of traffic, and was "T-boned" by a Ford F–250. Of the Yukon's passengers, only Jagr Royse survived the accident. Following a seven-day trial, involving testimony from twenty-eight witnesses, a jury found that Rodriguez had negligently operated the gravel truck, that TXI had negligently hired Rodriguez, and that Melendez had negligently entrusted the gravel truck to Rodriguez. After disregarding certain jury findings, the trial court entered a judgment against Appellants for $15,787,190 in compensatory damages and $6,658,000 in exemplary damages. Appellants raise six issues encompassing seventeen individually asserted subissues on appeal.[1] For the reasons set forth below, we will reverse the exemplary damages award and render judgment that Appellees take nothing on their claim for exemplary damages. We will also reverse the judgment against Melendez and render judgment that Appellees take nothing on the negligent entrustment claim asserted against him. We will affirm the remainder of the trial court's judgment.

**1.** The lettering of Appellants' subissues as set forth in the "Issues Presented" does not match the letting of the subissues in the "Argument and Authorities" section of Appellants' brief. In this opinion, we identify Appellants' issues and subissues by their numbering and lettering in the "Issues Presented."

**2.** The "truck" or the "tractor" is the cab portion of the vehicle, and the "trailer" is the

## II. FACTUAL BACKGROUND

On December 17, 2002, the Hughes family was returning to Paradise, Texas, after grocery shopping in Fort Worth. Kim Hughes was driving westbound on Highway 114. Four vehicles were traveling eastbound on Highway 114 in the vicinity of the accident. First, Cody Jobe was driving his 1989 Firebird Trans Am—the easternmost vehicle of the four traveling eastbound—and had driven onto the right-hand shoulder in preparation to turn right off Highway 114 into his father's driveway. Second, the gravel truck driven by Rodriguez was likewise traveling eastbound on Highway 114 approximately one-half mile behind Jobe. The gravel truck had an overweight permit, and its trailer was loaded with rocks so that it weighed approximately 84,000 pounds.[2] Third, the Ford F–250 pickup truck driven by Jerry Larance and pulling a twenty-foot trailer was traveling eastbound on Highway 114 approximately 200 yards behind the gravel truck. And finally, a Chevy Lumina driven by Michelle Wyndham was also traveling eastbound on Highway 114, following the pickup closely and getting ready to pass.

Jobe testified that, after he pulled onto the shoulder of Highway 114 and was preparing to turn into his father's driveway, he glanced in his rearview mirror and saw the gravel truck behind him.[3] Jobe turned right into his father's driveway and, when he parked and exited his car, he saw that a wreck had occurred right in front of his

attached container filled with gravel. We use the terms "gravel truck" and "TXI truck" in this opinion generically to encompass the entire vehicle driven by Rodriguez.

**3.** Jobe alternately testified that he did not see the TXI truck out of its lane of traffic and that he did not notice one way or the other; he just took a "quick glance" in the rearview mirror before he turned.

dad's mailbox.[4] Jobe ran back towards the accident scene to help. Jobe saw that Rodriguez, the driver of the gravel truck, had exited the gravel truck and had used a cell phone to call 911. Rodriguez handed the cell phone to Jobe saying, "You need to talk to them because they can't understand me." Jobe spoke with the 911 dispatcher and "[checked] pulses." Rodriguez told Jobe at the scene that "the Yukon or Suburban, whatever it was, was coming westbound, had a blowout, and hit him in the back of his truck, and then swerved back into the lane, and I guess that's where the Ford T-boned her there."

Rodriguez testified that he was driving a gravel truck for TXI, hauling a load on Highway 114 from Bridgeport to Paradise. According to Rodriguez, he never left his lane of traffic. Rodriguez testified that when he saw the Yukon "coming to" him, he turned to the right, toward the shoulder, in an effort to avoid the accident. Rodriguez told Aurelio Melendez, his boss, in a conversation an hour after the accident that he had steered right for two to three seconds prior to the collision. Subsequently, Rodriguez testified that he steered right for only one second prior to the collision. Rodriguez likewise gave different descriptions of the point of initial impact between the gravel truck and the Yukon. He told Melendez that the Yukon had hit at the third axle—the front set of wheels at the back end of the trailer. He told Jobe that the Yukon initially had hit the wheels at the back of his truck—not the trailer. He told the DPS investigator, Trooper Wanda Raney, that the Yukon had hit him on the left, driver's side, "touching" his tires. Jonathan Kennemer, TXI's corporate representative, claimed that Rodriguez told him at the accident

scene that the Yukon had hit the left front of the TXI truck, knocking off the clearance pole. The gravel truck's trailer left 358 feet of skid marks on Highway 114, partially documenting its angle of travel as it slowed and stopped on the eastbound shoulder of Highway 114. Drug and alcohol screens performed on Rodriguez immediately after the accident were all negative.

Jerry Larance testified that he had just gone through Paradise on Highway 114 and was about 200 yards behind the TXI gravel truck. He did not see the accident. He heard an explosion, looked up, and saw that the impact between the TXI truck and the Yukon had already occurred. Larance said that he did not see either the gravel truck or the Yukon outside of its own lane. The Yukon, after sliding down the side of the gravel truck, emerged from behind the gravel truck, and skidded on its wheel rims into the eastbound lane of traffic. Larance's pickup "T-boned" the Yukon.

George Wilton was a front-seat passenger in Larance's pickup. He said that he did not see the Yukon until it appeared off the end of the TXI trailer; before that, the trailer had blocked it from view. Wilton did not see either vehicle outside of its proper lane.

Finally, Michelle Wyndham testified that she lived in Paradise and on December 17, 2002, was taking her son to a doctor's appointment in Boyd. She was in a hurry and running late. She approached Larance's pickup and trailer, intending to pass him. As she pulled out to pass, she saw the Yukon coming towards her. She braked and slid to a stop. She saw Larance hit the Yukon. Wyndham exited her van and heard a baby crying. She approached the Yukon, determined that Jagr

---

**4.** Jobe testified that he was listening to music with headphones on; he did not hear the collision.

was crying, and got him out of the Yukon. Wyndham testified that she never saw the gravel truck at all.

## III. Admission of Appellees' Accident reconstruction Expert's Testimony and Exclusion of an Opinion of The DPS Trooper

In their issue II, Appellants claim that the trial court erred by admitting the testimony of Appellees' accident reconstruction expert, Kurt Marshek.[5] Appellants filed a pretrial motion to exclude Marshek's testimony, and the trial court denied it. In subpart F of their issue I, Appellants claim that the trial court erred by excluding Trooper Wanda Raney's opinion that the accident was caused by a tire blowout on the Yukon and by excluding the accident report prepared by Raney. We address these rulings by the trial court together because they involve the same standard of review.

### A. Standard of Review

■ Upon objection by the opponent of the evidence, the proponent of expert testimony has the burden to prove that the evidence is admissible. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995). A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). The testimony must be shown to be reliable before it is admitted. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998). The trial court is required to assess the reliability— not the truth or falsity—of the expert's opinion. *Robinson*, 923 S.W.2d at 558. The criteria for assessing reliability vary

depending on the type of expert and the nature of the evidence. *Gammill*, 972 S.W.2d at 726–27; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). There must not be too great an analytical gap between the data or observations and the expert's conclusions. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex.2004).

■ The trial court has broad discretion in determining admissibility of an expert's testimony. *Robinson*, 923 S.W.2d at 556–57. We can reverse the district court's determination regarding admission of expert testimony only if the trial court abuses its discretion. *Id.* at 558. We analyze an alleged abuse of discretion by examining whether the trial court acted without reference to any guiding rules or principles. *See id.* We cannot find an abuse of discretion merely because we disagree with the trial court's decision. *See id.* And we will not reverse a trial court for an erroneous evidentiary ruling, including an evidentiary ruling regarding the admissibility of documentary evidence, unless the error probably caused the rendition of an improper judgment. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex.2000); *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).

### B. Reliability of Marshek's Testimony

Here, Appellants claim that Marshek's testimony fails the second prong of the test governing the admissibility of expert testimony: the requirement that the testimony be based on a reliable foundation.

---

5. Marshek testified that he had a BS, MS, and PhD in mechanical engineering. He had performed accident reconstruction work since 1968.

*See Helena Chem. Co.*, 47 S.W.3d at 499. Thus, we limit our analysis to this issue.

Marshek explained that in reconstructing this accident, he reviewed the data from the Yukon's "black box," [6] obtained a copy of the police report, reviewed photos that were taken of the accident scene, and went to the accident site and took measurements there. The marks on the road made by the collision were still visible when Marshek viewed the scene. He ran skid tests at the accident site to obtain the coefficient of friction on that particular roadway. He inspected the remains of the Yukon.[7] And he reviewed statements made by Rodriguez and others.[8] Marshek generated a drawing of the accident site,[9] two drawings showing how he concluded that the accident had occurred,[10] a freeze-frame drawing showing twelve mini drawings sequencing the collision,[11] and several other exhibits; the trial court admitted all of these exhibits after Appellants indicated that they had no objection.[12]

A deep gouge mark in the pavement was made during the collision; this main gouge mark was about a foot inside the eastbound lane and angled westward toward the center line. That is, the westernmost point of the gouge mark was closest to the center line. Marshek opined that prior to the accident the gravel truck had crossed the center line and was either totally or partially in the Yukon's lane, the westbound lane of traffic. He said that the gravel truck was in the process of returning to its proper lane, traveling into the eastbound lane at the angle represented by the main gouge mark in the road. According to Marshek, when the collision occurred, the truck portion of the gravel truck was back in its proper lane, but the trailer was still at least partially across the center stripe in the westbound lane. The initial point of impact between the gravel truck and the Yukon was at the trailer's second axle and the Yukon's front left tire. Photos offered into evidence showed large dents in the rims of the gravel truck's front wheels at the trailer's second and fourth axles.

Marshek explained that the gouge in the pavement was made "right underneath the [gravel truck's] second axle where the [Yukon's left front tire] strikes that tire." As the Yukon struck the gravel truck-because the gravel truck sat so much higher off the

6. The "black box" is a sensing diagnostic module (SDM) and is specific to GM vehicles. The SDM contains five seconds of pre-impact data, recording the speedometer reading, the RPM of the engine, and brake application.

7. The dissent claims that Marshek did not "examine either the left front or left rear wheel rims of the Yukon." But Marshek testified that he did examine the remains of the Yukon, and both wheel rims were offered into evidence, discussed by Marshek at trial, and even forwarded to this court at our request.

8. The dissent contends that Marshek's testimony is "contrary to eye-witness testimony." The dissent apparently believes that the witnesses' statements that they did not notice the gravel truck driving out of its lane are the equivalent of affirmative testimony that the gravel truck never left its lane. But this is not

true; each witness also testified that they did not see the Yukon out of its lane, and most of the witnesses said that they simply did not see or notice the position of the vehicles one way or the other. We cannot agree that a witness's testimony that he or she did not notice whether the gravel truck was out of its lane conflicts in any way with any of the experts' testimony concerning the position of the gravel truck.

9. Plaintiffs' exhibits numbers 12 and 13.

10. Plaintiffs' exhibits numbers 14 and 15.

11. Plaintiffs' exhibit number 22.

12. The dissent fails to mention or discuss these pertinent exhibits admitted without objection.

roadway, had larger tires, and weighed so much more than the Yukon—the gravel truck exerted a downward force on the Yukon, and the Yukon's left front tire "[went] down on its rim."[13] That rim created the main gouge mark on the pavement. As the lighter Yukon slid down the side of the gravel truck's fully-loaded 84,-000 pound trailer, the Yukon was forced into traveling at the same angle that the trailer was traveling in its return to the eastbound lane.[14] Photos offered into evidence show maroon or red paint from the Yukon on the trailer's tires and black rubber from the trailer's tires down the entire left side of the Yukon. According to Marshek, the gouge mark establishes the direction that the trailer was traveling at the time of the accident, that being at an angle from the westbound lane back into its proper, eastbound lane.

Photos of the scene showed that the gravel truck made skid marks as it pulled over and stopped on the shoulder. Measurements established that the skid marks began 128 feet from the alleged point of impact—the gouge mark—and that the total distance from impact to the gravel truck's final stopped position was 486 feet. Marshek explained that if the angle of the skid marks is lined up with the angle of the gouge mark, the resulting path is a smooth right-steer maneuver, moving the gravel truck from partially across the center line to its resting point. He explained that if the gravel truck was not out of its lane across the center line but instead was centered in its proper lane of traffic and it turned right prior to the impact as Rodriguez said, the gravel truck would have had to perform a right maneuver and then an immediate and quick left maneuver in order to line up with the skid marks made by the trailer. Marshek opined that the direction changes required to perform the steer right, then quick-left maneuver would be very difficult for a fully loaded gravel truck to perform and agreed that rock spillage was possible with the right-quick-left maneuver but that no rock spillage occurred here.

Marshek explained that, using the speed of the Yukon from the SDM and Rodriguez's testimony that he was traveling at approximately the speed limit of sixty miles per hour and that he steered right for one to three seconds before the collision occurred, Rodriguez had to have been at least partially over the center line when the accident occurred. If the gravel truck was not over the center line, was traveling the speed limit of sixty miles per hour centered in its own lane, and turned right for one second before the collision—with no quick-left maneuver—its trailer would have been six feet to the right of the gouge mark.[15] For the most part, the remainder of Marshek's testimony involved analyzing and controverting portions of the testimony of Appellants' main accident reconstruction expert, John Painter.[16]

 Appellants' claim that Marshek's opinion that the gravel truck was at least

---

13. Photos of the Yukon after the accident show that the Yukon's left front tire is gone; only the wheel rim remains, and it is badly damaged.

14. Marshek explained that the gravel truck's path of travel would not have been altered by the Yukon; the Yukon weighed less than one-sixteenth of the gravel truck's loaded weight. Marshek said it would be "like a fly hitting a boulder."

15. Marshek's mathematical calculations are set forth in his testimony.

16. Appellants initially hired Lee Jackson as their accident reconstruction expert, but John Painter subsequently replaced him; the opinions of both these experts, sometimes conflicting, were introduced into evidence.

partially across the center line at the time of the collision is unreliable for three reasons: first, he wrongly assumed that the gouge mark was the initial point of impact between the vehicles; second, he did not take into account damage and markings on the gravel truck's cab; and third, he wrongly assumed that the Yukon made the gouge mark while traveling down the left side of the gravel truck's trailer when the gouge mark could have been made by a rebounding motion by the Yukon.[17]

All of the accident reconstruction experts agreed that the main gouge mark on the road was made during the collision in question. The parties disputed, however, the initial point of contact between the vehicles and how the gouge mark was made. Concerning the initial point of impact between the vehicles, Appellants' second accident reconstruction expert, John Painter, contended that the initial point of impact between the Yukon and the gravel truck was on the gravel truck's front left bumper. But Appellants' first accident reconstruction expert, Lee Jackson, testified that the gouge mark represented the initial point of impact between the vehicles.[18] Appellees claimed the initial point of impact was the Yukon's left front tire hitting the gravel truck's second axle.[19] Appellants claim that debris found in the roadway east of the gouge mark showed that the point of impact was further east than the gouge mark. Marshek testified that both the Yukon and the TXI truck were traveling approximately eighty-eight feet

per second at impact and that an impact at those speeds would scatter debris everywhere. Marshek also testified that the emergency vehicles dispatched to the scene likely drove through and further scattered the debris on the roadway. Concerning how the gouge mark was made, Appellants' two accident reconstruction experts, Painter and Jackson, contended that the gouge mark was made when the Yukon's left front tire struck the gravel truck's trailer at the fourth axle; Appellants' tire expert Charles Gold testified, however, that the gouge mark was made by the Yukon's passenger-side left rear tire, not its front tire. Marshek contended the gouge mark was made when the Yukon's left front tire struck the gravel truck's second axle.

Concerning Appellants' contention that Marshek erroneously used the main gouge mark as the point of initial impact between the vehicles, the dispute over the vehicles' point of initial impact is simply a factual one. Marshek and Jackson both personally saw the roadway and unequivocally testified that the main gouge mark represented the point of initial impact between the vehicles. Trooper Wanda Raney equivocated on this point, alternately saying that the gouge mark was the point of initial impact and that the Yukon initially made contact with the gravel truck's clearance pole. Rodriguez himself equivocated on the point of initial contact between the vehicles. He told Kennemer that the Yu-

---

17. Contrary to the dissent's position, neither Appellants' issue II nor the four pages in Appellants' brief devoted to this issue articulate a challenge to any scientific methodology utilized by Marshek.

18. Jackson testified,
 Q. And you formed an impression that the gouge mark was the point of impact between the Yukon and the rock truck; correct?

 A. Correct.
 Even though one of Appellants' own accident reconstruction experts *agreed* with Marshek that the gouge mark was the initial point of impact, the dissent complains that Marshek's purported "assumption of this fact" is not based on proper scientific methodology.

19. Marshek testified that this was the initial point of impact.

kon had hit at the third axle—the front set of wheels at the back end of the trailer. He told Jobe that the Yukon initially hit the back of his truck—not the trailer. He told the DPS investigator, Raney, that the Yukon hit him on the left side "touching" his tires. He told Melendez in a conversation within an hour of the accident that he had tried to avoid a head-on collision, so he had steered as far as he could to his right, and that the Yukon had hit the gravel truck on its third axle.

Likewise, the alleged marks on the gravel truck's cab present a factual issue on the point of initial contact between the vehicles. Appellants claim black marks on the gravel truck's driver side clearance pole [20] and on the truck's cab were made by the Yukon's driver's side mirror. But Appellees point out that the gravel truck had been in another accident before the pictures were taken allegedly showing the black-mark damage to the gravel truck's cab. Appellees also claim that some of the purported black-mark damage was not visible in the photos tendered by Appellants to document it.[21]

Finally, no witness testified that the main gouge mark was made by a "rebounding" motion of the Yukon.[22] Painter testified that it was made when the front left wheel of the Yukon struck the fourth axle of the truck.

Thus, Appellants' complaints concerning the reliability of Marshek's testimony focus on whether certain disputed facts exist, not on Marshek's methodology or techniques; Appellants' challenge to facts disputed at trial does not constitute a true challenge to the reliability of Marshek's conclusions. Texas has a long history of allowing qualified accident reconstruction experts to testify regarding the way in which an accident occurred. *See, e.g., Chavers v. State*, 991 S.W.2d 457, 460–61 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd); *Waring v. Wommack*, 945 S.W.2d 889, 893 (Tex.App.-Austin 1997, no writ); *Trailways, Inc. v. Clark*, 794 S.W.2d 479, 483 (Tex.App.-Corpus Christi 1990, writ denied); *DeLeon v. Louder*, 743 S.W.2d 357, 359 (Tex.App.-Amarillo 1987), *writ denied*, 754 S.W.2d 148 (Tex.1988); *Bolstad v. Egleson*, 326 S.W.2d 506, 519 (Tex. Civ.App.-Houston 1959, writ ref'd n.r.e.). At most, the factual disputes that Appellants argue Marshek erroneously premised his opinions on affect the credibility of Marshek's testimony, not the reliability of his theories. *See Ford Motor Co. v. Ledesma*, 173 S.W.3d 78, 87–88 (Tex.App.-Austin 2005, pet. granted) (holding expert testimony of accident reconstruction concerning mark left on roadway, allegedly by truck's driveshaft, went to credibility not reliability of expert's theories); *Waring*, 945 S.W.2d at 893 (holding no abuse of discretion occurred in admission of accident reconstruction expert's testimony concerning location of the car and bicycle, the turning arc of the car, the speed of the descending bicycle, the point of im-

---

**20.** The gravel truck's clearance pole was introduced into evidence and forwarded to this court and, at this point in time, no black marks are visible on it.

**21.** Moreover, on the issue of possible contact by the Yukon with the gravel truck's clearance pole, no testimony exists that if the Yukon touched the clearance pole, then the trailer could not have been across the center line. That is, the jury did not have to reject the clearance pole as the initial contact point between the vehicles in order to find Rodriguez negligent.

**22.** As the dissent points out, a slight amount of "restitution" or a slight rebound may have occurred when the Yukon struck the second axle, but no evidence exists that this "restitution" *caused* the gouge mark; Marshek testified the gouge mark was created by the downward force of the trailer on the Yukon's front left tire and subsequently, tire rim.

pact, and the reaction time of each driver; defendant's complaint was "more directed to the accuracy of the conclusions reached by the expert than to his methodology or the theory underlying accident reconstruction ...". The accuracy of the facts Marshek relied upon was thoroughly challenged by Appellants on cross-examination and through portions of the testimony of Appellants' own accident reconstruction experts.

Therefore, we hold that the trial court did not abuse its discretion by admitting Marshek's testimony.[23] We overrule Appellants' issue II.

### C. Trooper Raney's Qualifications and the Reliability of Her Causation Opinion

Appellants complain that the trial court erred by refusing to admit Trooper Raney's "opinion testimony or the DPS accident report." Trooper Raney was the first DPS trooper to arrive at the accident scene, and she prepared an accident investigation report. Under the "Conclusion:" portion of the investigation report, the form instructs the trooper completing it, "Why did this accident happen? Be definite and specific. This is your opinion— Remember no proof is necessary for your opinion." Under this section of the report, Trooper Raney gave her opinion as to how the accident occurred.

Appellees contended at trial that Trooper Raney was not qualified as an accident reconstruction expert to propound an opinion on the cause of the accident and that, in any event, her opinions on possible causes of the collision were unreliable as expressly, by the report's own completion instructions, not based on any scientific data. Appellants asserted in the trial court, as they do here, that the report was admissible under Texas Rule of Evidence 803(8)(B) and the case of *McRae v. Echols*, 8 S.W.3d 797, 799 (Tex.App.-Waco 2000, pet. denied). The trial court ruled that Trooper Raney's opinion of the cause of the accident would not be admitted but that her observations and findings at the scene were admissible. The trial court likewise ruled that the report of Trooper Raney's investigation was inadmissible; subsequently, however, the trial court admitted several pages of the report into evidence as defense exhibits.

The record reflects that during Appellees' case-in-chief, Trooper Raney testified by deposition. Appellees offered a videotaped deposition clip covering approximately three pages in the reporter's record, Appellants then offered a clip covering approximately six pages in the reporter's record, and Appellees offered a

**23.** Although the dissent would hold that the trial court abused its discretion by admitting all of Marshek's testimony, Appellants' first expert, Lee Jackson, and Appellants' second expert, John Painter, both agreed with some critical portions of Marshek's testimony and with some of Marshek's opinions. For example, Jackson agreed that Hughes was presented with a classic fake-left syndrome circumstance. Painter's own line-of-sight analysis proved that if the TXI truck had been in its own lane, the Yukon should have been visible to George Wilton; evidence exists that it was not. And Painter admitted that he had observed vehicles move across the center line to pass a vehicle making a right turn on the shoulder, the exact situation Rodriguez encountered. Nonetheless, without conducting any harm analysis concerning what the dissent would hold was an abuse of discretion in the admission of all of Marshek's testimony, without reviewing the other evidence that the TXI truck was across the center line, and without dissenting concerning the legal and factual sufficiency of the evidence to support the jury's finding that Rodriguez was negligent, the dissent would reverse the trial court's judgment and render judgment that Appellees take nothing.

rebuttal clip covering two pages in the reporter's record. Neither side asserted objections to any of the video clips. In Appellants' case-in-chief, Trooper Raney testified live. Trooper Raney testified that this was the first fatality accident that she had handled as a lead investigator. She had been a DPS trooper for eight months and had previously participated in the investigation of six fatality accidents. Three months prior to the accident, Trooper Raney had completed the second of DPS's six testing levels for accident investigation.

Trooper Raney testified concerning her arrival at the accident scene and her observations and findings there, including the gouge mark, the point of impact between the vehicles, maroon paint and black marks that she observed on the gravel truck's cab and clearance pole, and the paint chips on the roadway east of the gouge mark. She said that she attributed the maroon marks on the left side of the gravel truck's cab and smokestack and the black marks on the TXI truck's left-side clearance pole to the collision with the Yukon. She testified that she knew at the outset of her investigation that the Yukon had suffered damage to its tires because both the front and rear passenger side wheels of the Yukon were down to the rims. According to Trooper Raney, some of the pictures of the scene showed "skip marks" where the rims of the Yukon had made divots in the roadway pavement as the Yukon "sideswiped" down the left side of the TXI truck.

The bulk of the case law supports Appellants' position that Trooper Raney's opinions about the cause of the accident were admissible. See, e.g., Ter–Vartanyan v. R & R Freight, Inc., 111 S.W.3d 779, 781 (Tex.App.-Dallas 2003, pet. denied) (holding police officer trained in accident reconstruction was qualified to give expert opin-ion on the cause of accident); Sciarrilla v. Osborne, 946 S.W.2d 919, 923–24 (Tex. App.-Beaumont 1997, writ denied) (same); DeLeon, 743 S.W.2d at 359 (permitting investigating officer with accident reconstruction training to testify regarding causation); see also Lingafelter v. Shupe, No. 10–03–00113–CV, 2004 WL 2610515, at *4 (Tex.App.-Waco Nov.17, 2004) (mem.op.) (recognizing that "[t]he opinion of an investigating officer with level two reconstruction training is admissible"), rev'd on other grounds, 192 S.W.3d 577 (Tex.2006). But see Pilgrim's Pride Corp. v. Smoak, 134 S.W.3d 880, 891–92 (Tex.App.-Texarkana 2004, pet. denied) (holding police officer not trained in accident reconstruction was not qualified to opine on whose negligence caused the accident); Clark v. Cotten, 573 S.W.2d 886, 886–88 (Tex.Civ.App.-Beaumont 1978, writ ref'd n.r.e.) (holding trial court did not abuse its discretion by excluding opinions of investigating officer who was a regular police officer because he had received no training in accident reconstruction).

■ At the conclusion of trial, Appellants offered Trooper Raney's complete accident investigation report into evidence as Defense Exhibit 430. The trial court refused to admit it. Generally, accident reports prepared by investigating officers— possessing sufficient training in accident reconstruction—are admissible under Texas Rule of Evidence Rule 803(8) as an exception to the hearsay rule. Tex.R. Evid. 803(8); Sciarrilla, 946 S.W.2d at 923–24; Carter v. Steere Tank Lines, Inc., 835 S.W.2d 176, 181 (Tex.App.-Amarillo 1992, writ denied) (citing Clement v. Tex. Dep't of Pub. Safety, 726 S.W.2d 579, 581 (Tex.App.-Fort Worth 1986, no writ)); Porter v. Tex. Dep't of Pub. Safety, 712 S.W.2d 263, 265 (Tex.App.-San Antonio 1986, no writ).

For purposes of our analysis, we will assume that the trial court abused its discretion, as asserted by Appellants, by excluding the testimony of Trooper Raney—that the gravel truck took correct evasive action, that the Yukon veered into Rodriguez's lane of traffic, concerning the point of impact between the vehicles, and that a blowout on the Yukon caused the accident—and by refusing to admit Trooper Raney's accident report in its entirety. We review the entire record to determine whether any trial court error in the exclusion of Trooper Raney's opinion testimony or whether any error in the trial court's exclusion of Trooper Raney's accident report probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1) (providing that appellate court may not reverse trial court judgment unless the error probably caused rendition of an improper judgment); *Owens–Corning Fiberglas,* 972 S.W.2d at 43 (same).

Concerning the exclusion of Trooper Raney's testimony that the gravel truck took correct evasive action, this alleged fact was repeatedly placed before the jury. Rodriguez testified that he steered right before impact to avoid the collision. Melendez, Kennemer, and Painter all testified that Rodriguez had likewise told them that he steered right to avoid the accident. Trooper Raney's excluded, non-eyewitness testimony that Rodriguez took correct evasive action would have been only cumulative of the evidence and testimony on this issue. Consequently, we cannot hold that the exclusion of Trooper Raney's testimony that Rodriguez took correct evasive action to avoid the collision probably caused rendition of an improper judgment.

Concerning the exclusion of Trooper Raney's testimony or opinion that the Yukon veered into Rodriguez's lane of traffic, this fact is virtually undisputed.[24] The question at trial was why. Appellees' theory of the accident was that Hughes veered into Rodriguez's lane because Rodriguez was partially or totally over the center line in Hughes's lane—possibly because he was giving a wide berth to Jobe as Jobe slowed, moved onto the right shoulder, and prepared to turn right from the eastbound lane of Highway 114—and that because at the point Hughes was required to make a decision regarding whether to steer right or left to avoid the oncoming gravel truck, a ditch and trees lined Highway 114 to her right, so she veered left. Appellants' theory was that Hughes veered into Rodriguez's lane because her Yukon suffered a blowout or because she was inattentive. We cannot hold that the exclusion of Trooper Raney's cumulative testimony as to this undisputed fact probably caused the rendition of an improper judgment.

Concerning the alleged exclusion of Trooper Raney's testimony or opinion as to the point of impact between the vehicles, the record reflects that in fact Trooper Raney did offer testimony concerning the point of impact between the two vehicles.[25] Thus, part of the testimony that Appellants claim was improperly excluded was actually admitted.

Concerning the exclusion of Trooper Raney's opinion that a blowout on the Yukon caused the accident, this possible cause of the accident was placed squarely before the jury by other witnesses' testimony. Appellants' expert Charles Gold testified that he had examined the Yukon's left rear tire and concluded that it had hit some-

---

24. Although Kim Hughes's contributory negligence was submitted to the jury, the jury failed to find that she was negligent; this jury finding is not challenged on appeal.

25. This testimony is reflected in volume six of the reporter's record, pages 248–51.

thing in the road that had cut it. According to Gold, the cut in the Yukon's left rear tire was 10.5 inches long, caused the tire to immediately deflate, and caused the Yukon to swerve into the gravel truck's lane of traffic. Likewise, Jobe testified that Rodriguez told him at the accident scene that he, Rodriguez, believed the Yukon had experienced a blowout. Thus, even without Trooper Raney's testimony, the issue of whether the accident was caused by a blowout on the Yukon was placed before the jury.[26] Accordingly, the exclusion of Trooper Raney's opinion that a blowout on the Yukon caused the accident, even if erroneous, did not cause the rendition of an improper judgment. *See, e.g., Nissan Motor Co., v. Armstrong*, 32 S.W.3d 701, 708–09 (Tex.App.-Houston [14th Dist.] 2000) (holding that even discounting the erroneously admitted expert testimony, in light of the entire record, the jury could have based its affirmative answer "that the throttle cable system on Nissan's ZX series was defective and that such defect was the cause of Ms. Armstrong's injury" on other evidence properly admitted), *rev'd on other grounds*, 145 S.W.3d 131 (Tex. 2004).

Our analysis applies equally to any harm emanating from the exclusion of Trooper Raney's accident report. Appellants claim that the trial court's exclusion of "the DPS findings" contained in the accident report was "reversible error . . . because the evidence was germane to a hotly contested key issue." But Appellees point out the trial court ruled that Trooper Raney could, and she did, testify extensively concerning her factual findings at the scene; also,

some pages of the accident report were admitted into evidence. We have thoroughly reviewed the accident report, and it appears that the factual findings in it, as well as the opinions set forth in it, were all admitted into evidence, albeit by testimony and exhibits other than the accident report. Consequently, the exclusion of the accident report, even if erroneous, did not cause the rendition of an improper judgment. *See Owens–Corning Fiberglas*, 972 S.W.2d at 43.

Because any trial court error in excluding Trooper Raney's opinions or in excluding the accident report did not cause the rendition of an improper judgment, we overrule Appellants' issue I, subpart F.

### IV. *Batson*[27] Challenge

In issue I, subpart B, Appellants claim that the trial court reversibly erred by denying their *Batson* challenge to a peremptory strike exercised against a Hispanic juror, Frank Gonzalez. *See Batson*, 476 U.S. at 89, 106 S.Ct. at 1719 (declaring that racially motivated use of peremptory challenges in criminal cases violates equal protection and requires reversal); *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630–31, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991) (extending the application of *Batson* to civil trials).

#### A. Standard of Review

■ Resolution of a *Batson* challenge involves a three-step process: (1) the opponent of the peremptory challenge must establish a prima facie case of racial discrimination; (2) the party who exercised

---

**26.** On cross-examination, Gold testified that he was unaware that Appellants' second accident reconstruction expert, John Painter, had testified that no evidence existed that any tire on the Yukon failed prior to the Yukon's impact with the gravel truck. Appellants' first expert, Lee Jackson, and Appellees' expert,

Kurt Marshek, likewise testified that no evidence existed of a tire failure on the Yukon prior to its impact with the gravel truck.

**27.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

the strike must provide a race-neutral explanation; and (3) if the striking party does so, the party challenging the strike must prove purposeful racial discrimination. *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995); *Goode v. Shoukfeh,* 943 S.W.2d 441, 445 (Tex.1997).

## B. Factual Background

Appellees exercised a peremptory strike to remove Gonzalez from the jury panel, and no Hispanic jurors served on the jury. Appellants thus established a prima facie case of racial discrimination. Appellees provided two explanations for striking Gonzalez: (1) he was a relative newcomer to Wise County; and (2) he worked for a large corporation, American Airlines.

## C. Application of the Law to the Present Facts

The issue for the trial court and the appellate court at this juncture is the facial validity of the explanation given. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771; *Goode,* 943 S.W.2d at 445; *Brumfield v. Exxon Corp.,* 63 S.W.3d 912, 916 (Tex. App.-Houston [14th Dist.] 2002, pet. denied). In evaluating whether the explanation offered is race neutral, a court must determine whether the peremptory challenge violates the Equal Protection Clause as a matter of law, assuming the reasons for the peremptory challenge are true. *Goode,* 943 S.W.2d at 445. A race-neutral explanation means that the challenge was based on something other than the juror's race. *Id.* Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race neutral for purposes of the analysis at step two. *Id.* Appellees' stated reasons for striking Gonzalez meet step two's requirement of setting forth a race-neutral explanation.

Moving to step three of the analysis, Appellants claim that Appellees' stated reasons for striking Gonzalez are pretextual and that the record establishes purposeful racial discrimination because two other jury panel members whom Appellees did not strike were newcomers to Wise County, because Appellees did not individually question Gonzalez, and because a note by Appellees' counsel beside the name of another, different jury panel member stated, "Looks Hispanic." At the third stage of the *Batson* analysis, the trial court may determine whether the party challenging the strike has proven purposeful discrimination, and the trial court may believe or disbelieve the explanation offered by the party who exercised the peremptory challenge. *See id.* at 446.

Factors the trial court may consider in determining whether the explanation for a peremptory challenge is merely a pretext include (1) explanations not related to the facts of the case; (2) a lack of meaningful questioning of the challenged juror; (3) disparate treatment, i.e., persons with the same or similar characteristics as the challenged juror not being struck; (4) disparate examination of venire members, i.e., questioning a challenged juror to evoke a certain response without asking the same question of other panel members; and (5) an explanation based on a group bias where the trait is not shown to apply to the challenged juror specifically. *Brumfield,* 63 S.W.3d at 916 (citing *Whitsey v. State,* 796 S.W.2d 707, 713–14 (Tex. Crim.App.1989)).

Here, the record does not demonstrate that the trial court abused its discretion by concluding that Appellants had not established purposeful discrimination by striking Gonzalez. The nonexclusive factors set forth in *Brumfield* do not weigh in favor of a finding of a pretextual explanation; to the contrary, a venire member's

length of residence in the community and occupation have been held to be proper, race-neutral reasons for exercising a peremptory strike. *See, e.g., U.S. v. Lance,* 853 F.2d 1177, 1180–81 (5th Cir.1988) (upholding peremptory strike where prosecutor explained that he challenged the venire member because he was "young, single, and without children or 'a substantial stake in the community' "); *Newsome v. State,* 829 S.W.2d 260, 266 (Tex.App.-Dallas 1992, no pet.) (upholding peremptory strikes exercised on venire members because they were either a teacher, a recent Dallas resident with few ties to the community, or a former East Coast resident); *Hernandez v. State,* 808 S.W.2d 536, 544 (Tex.App.-Waco 1991, no pet.) (holding that State's reasons for exercising peremptory strike— that venire member was not employed, appeared to lack community ties, and had worn a T-shirt to court—were sufficient race-neutral reasons); *Crawford v. State,* 770 S.W.2d 51, 54 (Tex.App.-Texarkana 1989, no pet.) (upholding peremptory strike where prosecutor stated that he struck venire member because she was "young and had not been in the community long"); *see also United States v. Milan,* 304 F.3d 273, 282 (3d Cir.2002) (holding that district court did not err by finding that prosecutor was not motivated by discriminatory intent in exercising peremptory strike because prosecutor explained that he struck venire member because she had only lived in area for three years and would not "blend" with other jurors who were more familiar with local geography and more interested in community), *cert. denied,* 538 U.S. 1024, 123 S.Ct. 1956, 155 L.Ed.2d 869 (2003).

Because the trial court did not abuse its discretion by concluding that purposeful discrimination had not been established, we overrule Appellants' issue I, subpart B.

## V. VENUE

In issue I, subpart C, Appellants argue that the trial court erred by denying their motion to transfer venue, which alleged that rock haulers such as Appellants could not obtain a fair trial in Wise County.

### A. Standard of Review

Texas Rule of Civil Procedure 257 allows a trial court to transfer venue if there is so great a prejudice against the movant that he cannot obtain a fair and impartial trial or if an impartial trial cannot be had in the county where the action is pending. TEX.R. CIV. P. 257(a), (c). When a motion to transfer venue based on such prejudice is duly and properly made, it shall be granted, unless the party opposing the transfer attacks, by the affidavit of a credible person, the facts set forth in the motion to transfer or the affidavits supporting it. TEX.R. CIV. P. 258; *City of Abilene v. Downs,* 367 S.W.2d 153, 155 (Tex.1963). When thus attacked, the issue shall be tried by the judge. TEX.R. CIV. P. 258. The movant bears the burden of proof on a rule 257 motion for a change of venue. *Glover v. Moore,* 544 S.W.2d 777, 777–78 (Tex.Civ.App.-Eastland 1976, no writ) (citing *Bennett v. Jackson,* 172 S.W.2d 395, 398 (Tex.Civ.App.-Waco 1943, writ ref'd w.o.m.)). When a rule 257 motion to transfer venue is attacked as required under rule 258 and the issue is tried to the court, the trial court's decision to grant or to deny such a motion will not be disturbed on appeal absent a clear abuse of discretion. *Id.; Ferguson Seed Farms v. Fort Worth & D.-S.P. Ry. Co.,* 100 S.W.2d 177, 179–80 (Tex.Civ.App.-Amarillo 1936, writ dism'd).

### B. The Present Facts

Appellants' motion to transfer venue alleged that the residents of Wise County are prejudiced against gravel truck compa-

nies and drivers; the affidavits of more than three Wise County residents were attached, claiming that such a prejudice existed. Appellees filed a response to Appellants' motion to transfer venue and attached affidavits from three Wise County residents claiming that rock haulers could obtain a fair trial in Wise County. The trial court conducted a hearing on Appellants' motion to transfer venue and denied it. At the hearing, Appellants presented evidence that a private investigator had conducted a survey of 200 residents of Wise County and that the survey had revealed a local prejudice against gravel truck companies and drivers.[28] On cross-examination, the private investigator admitted that he had reviewed other cases involving gravel truck drivers and that he had not seen any evidence of prejudice against or unfairness towards gravel truck drivers in those cases. Appellees introduced without objection the affidavits of three Wise County residents who stated their beliefs that trucking companies and truck operators could receive a fair trial in Wise County.

## C. Application of the Law to the Facts

■ The evidence at the hearing on Appellants' motion to transfer venue was conflicting, and consequently the trial court did not abuse its discretion by denying Appellants' motion to transfer venue.

*See Clarkson v. Ruiz,* 140 S.W.2d 206, 207 (Tex.Civ.App.-San Antonio 1940, writ dism'd judgm't cor.) (holding that trial court did not abuse its discretion by resolving the conflicting testimony in favor of appellees and denying appellants' motion to change venue); *Gannaway v. Trinity Universal Ins. Co.,* 85 S.W.2d 345, 347 (Tex.Civ.App.-San Antonio 1935, writ ref'd) (same); *Ferguson Seed Farms,* 100 S.W.2d at 179–80 (holding that the "trial court has a wide discretion in passing on an application for a change of venue in a civil case where the grounds asserted are local prejudice").

We overrule Appellants' issue I, subpart C.

## VI. THE TWINS' DEATH

In subpart E of issue I, Appellants claim that the trial court erred by allowing Appellees to "try a claim for the wrongful death of unborn twin fetuses, when no such claim is recognized by Texas law, as the trial court ultimately ruled after verdict."[29]

Afton Hughes Royse was six weeks' pregnant with twins at the time of the accident. Appellee Clint Royse, Afton's husband, pleaded a cause of action for the wrongful death of the twins. The trial court admitted evidence concerning Afton's pregnancy and the twins' deaths. Although Appellants moved for a directed verdict on Clint's claim for wrongful death

---

**28.** Upon Appellees' objections, the trial court excluded the majority of the live testimony Appellants presented at the hearing, and Appellants preserved any error concerning this ruling through an offer of proof. *See* TEX.R. EVID. 103(a)(2). Appellants do not complain on appeal however that the trial court improperly excluded this evidence, and we do not consider the excluded evidence in our review.

**29.** At the time of the accident—December 17, 2002—and at the time of trial—May 4, 2004

to May 13, 2004—the controlling law in our appellate district was that the wrongful death statute unconstitutionally violated the Equal Protection Clauses in both the federal and state constitutions as applied to a viable unborn child. *See Reese v. Fort Worth Osteopathic Hosp., Inc.,* 87 S.W.3d 203, 205 (Tex. App.-Fort Worth 2002), *aff'd in part, rev'd in part,* 148 S.W.3d 94 (Tex.2004); *Parvin v. Dean,* 7 S.W.3d 264, 273–74 (Tex.App.-Fort Worth 1999, no pet.).

of the twins and also objected to submission of these claims to the jury, the trial court denied Appellants' motion and submitted special questions to the jury on the wrongful death of the twins. The jury awarded Clint Royse $200,000 for damages he suffered from the death of each twin. But the trial court subsequently granted Appellants' motion for judgment notwithstanding the verdict and rendered judgment that Clint take nothing on his claims for wrongful death of the twins.

 Although the trial court granted Appellants' motion for judgment notwithstanding the verdict on Clint's claims for wrongful death of the twins, Appellants nonetheless complain that they were prejudiced at trial by emotion-laden evidence about the unborn twins. The trial court submitted a damage question to the jury—authorizing the jury to compensate Clint Royse for the death of the twins—and the jury presumably utilized the very testimony that Appellants' claim was overly emotional to award $200,000 to Clint for the death of each twin. The trial court's charge instructed the jury to "not let bias, prejudice, or sympathy play any part in [their] deliberations" and to consider "the elements of damages listed below and none other," to "consider each element separately," to not include in any element of damages any sum of money for a loss included under another element, and to not compensate twice for the same loss. Accordingly, the jury was specifically instructed to consider the evidence that Appellants claim was prejudicially emotional, mostly Clint's testimony concerning the twins' death,[30] only in connection with the exact damage special questions that the trial court subsequently disregarded. Un-

less the record demonstrates otherwise, we must presume that the jury followed these instructions. *See, e.g., Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 771 (Tex.2003); *Tesfa v. Stewart,* 135 S.W.3d 272, 279 (Tex.App.-Fort Worth 2004, pet. denied). Appellants do not point to anything in the record, and we have found nothing, that would demonstrate that the jury did not follow these instructions. Thus, when the trial court set aside the damage awards that the jury attributed to the twins' deaths, it rectified the harm caused by the wrongful submission of these claims to the jury; that is, the award of $400,000 in damages to Clint based on the evidence Appellants allege was unfairly prejudicial. We hold that any error in permitting trial of Clint's claims for the wrongful death of the twins did not cause the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1) (prohibiting appellate court from reversing judgment for error of law unless the error probably caused rendition of an improper judgment).

We overrule subpart E of Appellants' issue I.

## VII. CHALLENGES TO EVIDENTIARY RULINGS

In issue I, subpart A, Appellants claim that the trial court reversibly erred by allowing the admission of evidence that Rodriguez was an illegal alien. In subpart D of issue I, Appellants claim that the trial court erred by excluding evidence that Kim Hughes, the driver of the Yukon, purportedly received a cell phone call at approximately the time of the collision.

---

**30.** We note that the fact of Afton's pregnancy with twins was admissible in connection with Afton's survival claim. *See Witty v. Am. Gen. Capital Distrib., Inc.,* 727 S.W.2d 503, 506 (Tex.1987) (holding that under the Texas Sur-

vival Statute, "[m]edical and funeral expenses of the fetus are expenses incurred by the mother as a direct result of her injury"). The crux of Appellants' complaint concerns the admission of Clint's testimony.

## A. Standard of Review

 We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 906. Unless an erroneous evidentiary ruling by the trial court probably caused the rendition of an improper judgment, we will not reverse the trial court's ruling. *Id.* An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp.*, 972 S.W.2d at 43.

## B. Admission of Evidence of Rodriguez's Status as an Illegal Alien

Appellants globally claim that the trial court erred by admitting evidence of the fact that Rodriguez was an illegal alien.[31] Appellants argued in a pretrial brief and argue on appeal that Rodriguez's immigration status was not relevant to any issue in the case, could not be used for impeachment, and was more prejudicial than probative and should have been excluded on that basis. Appellees argued in a pretrial responsive brief and argue on appeal that Rodriguez's status as an illegal alien was relevant and admissible to impeach Rodriguez and also in connection with Appellees' negligent hiring and negligent entrustment claims. The trial court ruled that Rodriguez's immigration status was admissible to impeach Rodriguez because he misrepresented his immigration status in his deposition and on his application to drive for TXI. The trial court instructed the lawyers outside the presence of the jury, however, to not belabor Rodriguez's immigration status and not to use it as an inflammatory tool.

Rodriguez testified by videotaped deposition as Appellees' first witness. In response to the question, "Did you ever lie about the fact that you were not a U.S. resident or U.S. citizen to get a Texas driver's license?" Rodriguez answered, "No." But Rodriguez later admitted that in 2000 after he had crossed the Mexico–Texas border at night, he was arrested for, and pleaded guilty to, an immigration violation; he spent four months in jail and was then deported to Mexico. Rodriguez said that when he came back to the U.S. approximately five months later, he just walked across the border. He said that he did not have a green card or a laser card but said that he was uncertain whether he re-entered the country legally because he was not a lawyer.

Rodriguez's "Driver's Application for Employment" dated May 18, 2001, was introduced into evidence as Plaintiffs' Exhibit 1. Rodriguez completed it to apply for work as a truck driver for Melendez and to drive for TXI. The application contains a question, "Do you have the legal right to work in the United States?" Rodriguez answered, "Yes." But Rodriguez gave the following sworn statement to the Department of Justice at the Del Rio port of entry into the United States on December 12, 1999, approximately nineteen months before he completed the "Driver's Application for Employment":

Q. What documents do you have to legally live and work in the U.S.?

A. I have no legal documents to live and work here.

 Appellants apparently argue that all questions and all documentary evidence touching on Rodriguez's status as an ille-

---

**31.** Appellants do not identify any specific pieces of evidence or any specific questions that they contend should have been excluded or not answered; they broadly assert that

"the plaintiffs relied on evidence of Rodriguez's status as an illegal immigrant with impunity. That evidence was inadmissible."

gal alien were inadmissible because "Texas Rule of Evidence 608(b) expressly prohibits the use of specific instances of conduct to impeach a witness's credibility." Here, however, Appellants did not introduce specific instances of misconduct to impeach Rodriguez; they impeached him with evidence of his own prior verbal statements, and this is specifically allowed under Texas Rule of Evidence 801(e)(2)(A). *See* TEX.R. EVID. 801(e)(2)(A); *accord Strong v. State,* 138 S.W.3d 546, 553, 558 (Tex.App.-Corpus Christi 2004, no pet.) (recognizing that "when the out-of-court statement is made not by a witness but by a party, rule 613 no longer applies, ... [s]uch statements are actually governed by rule 801(e)(2)(A), which provides that a statement is not hearsay if it is offered against a party and is that party's own statement"). We hold that the trial court did not abuse its discretion by admitting evidence of Rodriguez's immigration status to impeach his contrary trial testimony.[32]

█ Further, in light of our subsequent holdings herein that the evidence is legally and factually sufficient to support the jury's findings of negligence against Rodriguez and TXI and in light of the record as a whole, even if the trial court abused its discretion by permitting Appellants to impeach Rodriguez with prior inconsistent statements that he had made, we cannot conclude that any error in the admission of the fact that Rodriguez was an illegal alien probably caused the rendition of an improper judgment. *Accord Ramirez v. Acker,* 124 S.W.2d 905, 908 (Tex.Civ.App.-Beaumont 1939) (recogniz-

ing that defendants' counsel's argument that the jury would not "take the land in controversy from the defendants who were American citizens, and give it to an old Mexican who had not been naturalized" was an inflammatory appeal to racial prejudice but that trial court's instruction not to consider it and plaintiff's counsel's comments during closing that plaintiff was entitled to the same process as any litigant rendered error harmless), *aff'd,* 134 Tex. 647, 138 S.W.2d 1054 (Tex.1940); *cf. Penate v. Berry,* 348 S.W.2d 167, 168 (Tex.Civ. App.-El Paso 1961, writ ref'd n.r.e.) (holding defense counsel's closing argument urging jury to rule for defense because plaintiff was an alien and "in this country you can't come into court and reach your hands into the pockets of an American citizen and take his property from him— not for an alien" to be improper inflammatory appeal to racial prejudice). Here, Appellees' counsel made no inflammatory, improper arguments concerning Rodriguez's status as an illegal alien. In closing argument, Appellants' attorney specifically told the jury that whether Rodriguez "[lacked a] social security number" was a "red herring" in terms of challenging how the accident happened; he argued that Appellees had introduced this evidence "to appeal to your bias and your prejudice [,] and imply that he's an illegal alien." In view of the record as a whole, the evidence that Rodriguez was an illegal alien, even if improperly admitted, was not harmful under the standard that we are required to apply. *See* TEX.R.APP. P. 44.1(a)(1).[33] We overrule Appellants issue 1, subpart A.

---

**32.** Because we hold that Rodriguez's immigration status was admissible to impeach him concerning his representations that he never lied to get a driver's license and had the legal right to work in the United States, we need not address Appellants' complaints that Rodriguez's immigration status was not relevant and was more prejudicial than probative. *See*

*Owens–Corning Fiberglas Corp.,* 972 S.W.2d at 43 (requiring us to uphold evidentiary ruling if there is any legitimate basis for it).

**33.** The dissent would reverse the judgment on this issue without conducting any type of harm analysis. *See id.* (providing that "[n]o judgment may be reversed on appeal on the

### C. Exclusion of Evidence of Cell Phone Call

Appellants also complain in issue I, subpart D, that the trial court erred by excluding evidence of a cell phone call made by Randy Hughes to Kim Hughes's cell phone. Appellants argue that this cell phone evidence was admissible because it was relevant to the issue of whether Kim was negligent.[34] Appellants assert that Kim was distracted by the call or by the ringing of her cell phone and drifted over the center line of Highway 114. Appellees assert that the trial court correctly excluded the cell phone evidence for two reasons: because Appellants did not timely designate the witness that they called to explain the meaning of the cell phone bills and because no evidence existed connecting Randy's call to Kim's driving.

Appellants attempted to offer the testimony of Tonya Battles, a Cingular employee, to explain how cell phone calls are connected, charged, and appear on billing records. Appellees objected to Battles's testimony on the grounds that she had not been properly or timely designated as a fact witness and was never designated as an expert witness. Appellees pointed out that the cell phone bills at issue sometimes showed a two-minute call "where the next phone call would start one minute after that two-minute phone call supposedly began, so we don't believe the two-minute phone call just stands for what they are saying." The trial court sustained Appellees' objection to Battles's testimony on the ground that she had not been timely designated.

Rule 193.6(a) mandates the exclusion of the testimony of any witness other than a named party who was not timely designated unless the court finds that there was good cause for the failure to timely respond or that the failure to timely respond would not unfairly surprise or prejudice the other parties. Tex.R. Civ. P. 193.6(a); *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 202 (Tex.App.-Fort Worth 2005, no pet.). The burden of establishing good cause or the lack of unfair surprise or prejudice is on the party seeking to call the witness. Tex.R. Civ. P. 193.6(b).

■ In their reply brief, Appellants claim that Battles was properly designated as a fact witness in their supplemental responses to Appellees' request for disclosure. But neither Appellants' responses nor supplemental responses list Battles's name, address, or telephone number or provide a statement of her connection to the case. Appellants supplemental responses simply list as a fact witness the "Records custodians and employees of Southwestern Bell Mobile Systems, Acct. # 300313311" for Randy's telephone number and for Randy's December 2002 to January 2003 cell phone statement. Appellants' disclosure does not meet the requirements of rule 194.2(e) and does not constitute a proper fact witness disclosure. *See* Tex.R. Civ. P. 194.2(e). The trial court did not find, nor do Appellants argue that they established, good cause or the lack of unfair surprise or prejudice. Accordingly, the trial court did not abuse its discretion by excluding Battles's testimony. *See IAC, Ltd.*, 160 S.W.3d at 202.

---

ground that the trial court made an error of law unless the court of appeals concludes that the error complained of ... probably caused the rendition of an improper judgment"). The dissent is apparently willing to presume harm.

**34.** As previously mentioned, Kim Hughes's contributory negligence was submitted to the jury, the jury did not find her negligent, and the sufficiency of the evidence to support the jury's failure to find her negligent is not challenged on appeal.

■ Also under this subpart, Appellants claim that the trial court should have allowed them to question Randy in front of the jury concerning his call to Kim's cell phone. Wise County 911 emergency records, marked as Defense Exhibit 425, showed that Rodriguez's 911 call was received at 1:56 p.m. An offer of proof outside the jury's presence established that Randy's cell phone records, offered as part of the bill and identified as Defense Exhibit 441, show a call purportedly lasting two minutes from Randy's cell phone to Kim's cell phone at 1:55 p.m. and two more calls purportedly lasting one minute each from Randy's cell phone to Kim's cell phone at 1:57 p.m. and at 1:58 p.m. Kim's cell phone records show an "incoming" call from Randy's cell phone number at 1:55 p.m. Randy testified that no one answered Kim's cell phone when he called at around 1:55 p.m., that his call did not roll over to voice mail, and that he subsequently called Kim's cell number a couple more times.

Appellees claim that the trial court correctly excluded Randy's testimony concerning his cell phone call to Kim because no evidence exists connecting Randy's call to Kim's driving.[35] That is, Appellees argue there is no evidence Kim's cell phone rang, was not on vibrate, or was even in the front seat of the Yukon when Randy attempted to call. We recently addressed a similar issue in *Bedford v. Moore,* 166 S.W.3d 454, 463 (Tex.App.-Fort Worth 2005, no pet.). In *Bedford,* the plaintiff attempted to introduce evidence that a gravel truck driver tested positive for methamphetamine immediately after an accident. *Id.* The trial court excluded the

evidence, and we affirmed, explaining that no evidence existed tying the presence of methamphetamine in the driver's body to impairment at the time of the accident. *Id.* Consequently, we held that the trial court did not abuse its discretion by excluding this evidence. *Id.* Here, no evidence exists tying Randy's call to Kim's cell phone to Kim's driving at the time of the accident. Consequently, we cannot say that the trial court abused its discretion by excluding this evidence. *See, e.g., Morgenstern v. Knight,* 134 P.3d 897, 898 (Okla.Civ.App.2006) (holding that absent other facts, mere use of cell phone during accident did not even warrant submission to jury of contributory negligence by cell phone user).

We overrule Appellants' issue I, subpart D.

## VIII. CHARGE ERROR

In issue V, subparts A, B, C, and D, Appellants raise four challenges to the court's charge. Specifically, they claim that the trial court erroneously omitted a required element of Appellees' negligent hiring claim, erroneously submitted broad-form liability questions, erroneously refused to submit an unavoidable accident instruction, and erroneously submitted "gross neglect" instead of "malice" in connection with the exemplary damages question.

### A. Standard of Review

■ The standard of review for error in the jury charge is abuse of discretion, which occurs only when the trial court

---

35. At the pretrial hearing on this issue, Appellees' counsel explained that multiple cell phones were in use by the occupants of the Yukon around the time of the accident. Clint, Afton's husband, had testified that Afton—who was seated in the backseat of the Yukon—had been using Kim's cell phone to

speak with him prior to the accident. Additionally, Ashton Quinn—who was speaking with Shiloh Hughes on Shiloh's cell phone at the moment when the accident occurred—testified that she did not hear a cell phone ring in the Yukon immediately before the accident.

acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). A party is entitled to a jury question, instruction, or definition that is raised by the pleadings and evidence. Tex.R. Civ. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002). This is a substantive, nondiscretionary directive to trial courts, requiring them to submit requested questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992).

■ The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury. *Toles v. Toles*, 45 S.W.3d 252, 263 (Tex.App.-Dallas 2001, pet. denied). This broad discretion is subject only to the limitation that controlling issues of fact must be submitted to the jury. Tex.R. Civ. P. 278; *Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 422 (Tex.App.-Corpus Christi 1990, writ denied) (op. on reh'g).

■ A trial court is afforded even more discretion when submitting instructions than when submitting questions. *Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex.App.-San Antonio 1998, pet. denied). The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006); *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex.2003).

## B. Allegedly Omitted Negligent Hiring Element

■ In issue V, subpart A, Appellants claim that the court's charge—special question number 1—omitted an essential element of Appellees' negligent hiring claim against TXI, that is, the requirement that TXI knew or should have known that Rodriguez was an incompetent or unqualified driver.[36] But Appellants failed to actually request submission of the purportedly omitted element via an issue or an instruction and failed to object to the charge's failure to submit the purportedly omitted element.[37] Consequently, even if

**36.** It is undisputed that a motor carrier has a duty to take steps to prevent injury to the driving public by determining whether an applicant to drive one of its trucks is competent and qualified. 49 C.F.R. §§ 391.21, .23 (2004); *Guidry v. Nat'l Freight, Inc.*, 944 S.W.2d 807, 810 (Tex.App.-Austin 1997, no writ).

**37.** Appellants' requested special question number 5 provided:

Did TXI Transportation Company negligently hire, qualify, retain and/or supervise Ricardo Reyna Rodriguez and, if so, was such negligent hiring, qualification, retention and/or supervision a proximate cause of the occurrence in question and resulting deaths and injuries?

TXI Transportation Company negligently hired, qualified, retained and/or supervised

Ricardo Reyna Rodriguez if he was an incompetent or unfit driver whom TXI knew, or by the exercise of reasonable care should have known, was unfit, thereby creating an unreasonable risk of harm to others. In this connection, you are instructed that TXI Transportation Company had no duty to investigate any nonvehicular criminal background of Ricardo Reyna Rodriguez, including his immigration status.

The proximate cause element of this question requires cause in fact and foreseeability. The test for cause in fact is whether the negligent act or omission, if any, was a substantial factor in bringing about the injury, without which the harm would not have occurred. Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission, if any. In this

this element was erroneously omitted from the charge, it is deemed found in support of the judgment.[38] *See* Tex.R. Civ. P. 279 (providing that omitted element of independent ground of recovery shall be deemed to support the judgment); *Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990).

 Additionally, the element that Appellants claim was omitted from the charge—that TXI knew or should have known that Rodriguez was an incompetent or unqualified driver—is not an express element of a negligent hiring action. A negligent hiring claim is a simple negligence cause of action based on an employer's direct negligence rather than on vicarious liability. *See Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); *Verinakis v. Med. Profiles, Inc.*, 987 S.W.2d 90, 97 (Tex.

App.-Houston [14th Dist.] 1998, pet. denied). The elements of a negligence action are a duty, a breach of that duty, and damages proximately caused by the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). So, to recover under a theory of negligent hiring, "a plaintiff must prove that (1) the employer owed a legal duty to protect third parties from the employee's actions and (2) the third party's sustained damages were proximately caused by the employer's breach of that duty." *Bedford*, 166 S.W.3d at 463 (citing *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 655 (Tex.App.-Dallas 2002, pet. denied)). A breach of the employer's duty may occur if the employer hires an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating

connection, you are instructed that if any prior conviction(s) of Richardo [sic] Reyna Rodriguez did not indicate criminal conduct in any way akin to the harm that occurred in this case, then no reasonable person could anticipate the result.
Answer "Yes" or "No."
Answer: _____
But at the charge conference, Appellants indicated that, in fact, they did not desire the submission of their proposed special question number 5:
Your Honor, next is No. 5. This is a request for -
We actually are not all that desirous of having this submitted, but this includes all of the elements we say of a negligent hiring retention claim, and we do not believe that the submission that will go to the jury includes all the requested elements.
I see the court has signed its refusal.
Thus, Appellants did not "request" submission of the element they now claim was erroneously omitted. They instead stated that they "were not all that desirous of having [their proposed question five] submitted." Nor did Appellants identify for the trial court the element that they believed was missing from "the submission that will go to the jury." And, although later in the charge conference

Appellants asserted numerous objections to the charge actually submitted by the trial court, Appellants did not assert an objection to special question number 1 concerning the omission of the negligent hiring element that they now complain was erroneously not submitted.

Nor did Appellants request an "instruction" on this element. The only "instruction" Appellants tendered in connection with special question number 1 was their special question number 5 set forth above, and the only objection Appellants made in connection with special question number 1 is likewise set forth above. Appellants' brief cites volume 10 of the reporter's record, page 112, as reflecting a request for an "instruction" in connection with special question number 1, but the record in this location reflects Appellants' objections to questions 21 and 22, and "no objection to one part of the charge may be adopted and applied to any other part of the charge by reference." *See* Tex.R. Civ. P. 274.

38. In a different issue, Appellants challenge the sufficiency of the evidence to support the jury's finding that TXI was negligent. We address that issue elsewhere in this opinion and ultimately hold that the evidence is legally and factually sufficient.

an unreasonable risk of harm to others. *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex.App.-Fort Worth 2002, no pet.) (citing *Verinakis*, 987 S.W.2d at 97, 98); *Leake v. Half Price Books, Records, Magazines, Inc.*, 918 S.W.2d 559, 563 (Tex. App.-Dallas 1996, no writ); *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178 (Tex.Civ.App.-Tyler 1979, writ ref'd n.r.e.). But other facts may also establish a breach of the employer's duty,[39] and the method of the alleged breach is simply not an element of a negligent hiring cause of action any more than the method of breach is an element of any other simple negligence cause of action. Consequently, in *Bedford*, this court held that "the proper submission in a single negligent entrustment or negligent hiring case is to submit the negligent entrustor or negligent hiring employer in the general liability and comparative questions" as was done in this case. *Bedford*, 166 S.W.3d at 464.

Moreover, the element that Appellants claim was omitted from the charge—that TXI knew or should have known that Rodriguez was an incompetent or unqualified driver—was actually incorporated in the court's charge via the definitions provided to the jury. Special question number 1 asked, "Did the negligence, if any, of those named below proximately cause the occurrence in question?" The jury answered "yes" for TXI and Rodriguez and "no" for Kim Hughes.[40] The definition of negligence submitted to the jury in special question number 1 explained that " 'Negligence' means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." "Ordinary care" was defined as "that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances." The proximate cause definition submitted with special question number 1 explained that "[i]n order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom."

Because the only theory of direct liability asserted against TXI was a negligent hiring claim, to find TXI negligent for hiring Rodriguez, the jury was required to find that TXI failed to do that which a for-hire interstate motor carrier of ordinary prudence would have done (i.e., recognize that Rodriguez was an incompetent or unqualified driver) and that this failure was a proximate cause of the "event," the collision, in that a for-hire interstate motor carrier using ordinary prudence would have foreseen that the event, or some similar event, might reasonably result from the failure. Thus, here, the definitions provided by the trial court in connection with special question number 1, which submitted Appellants' theory of direct liability against TXI—the negligent hiring claim-in a broad—form negligence question, placed the disputed issue of whether TXI knew or should have known that Rodriguez was an incompetent or unqualified driver before the jury. *See* Tex.R. Civ. P. 278; *see also, e.g., Toles*, 45 S.W.3d at 263 (recog-

---

39. For example, *see Builders Transport, Inc. v. Grice–Smith*, 167 S.W.3d 1, 10 (Tex.App.-Waco 2005, no pet.), *judgm't withdrawn and superseded on reh'g*, 167 S.W.3d 18 (Tex.App.-Waco 2005, pet. filed), recognizing a *negligent training* theory of recovery.

40. Appellants' negligent entrustment claim against Melendez was submitted in a separate special question.

nizing that the trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury); *accord Lorillard, A Div. of Loew's Theatres, Inc. v. Davis,* 770 S.W.2d 606, 608 (Tex.App.-Dallas 1989, writ dism'd w.o.j.) (holding that, based on definitions of negligence and proximate cause submitted in connection with broad-form negligence question, jury's affirmative answer necessarily encompassed finding on all elements of negligent entrustment action). We hold—assuming this issue had been properly preserved for our review—that special question number 1 and its accompanying definitions adequately submitted the factual issue of TXI's negligent hiring to the jury, including the element that TXI knew or should have known that Rodriguez was an incompetent or unqualified driver. *See Bedford,* 166 S.W.3d at 463 (noting that negligent hiring requires proof only that employer owed legal duty to protect third parties from employee's actions and that third party's damages were proximately caused by employer's breach of that duty); *Morris,* 78 S.W.3d at 50 (holding that the proximate cause element of negligence includes foreseeability).

▆ And finally, even if in the absence of an objection or a request, the trial court nonetheless somehow abused its discretion by not submitting some type of instruction concerning the element that Appellants now claim on appeal is missing from special question number 1 of the charge, such error would not be harmful because, as set forth above, under the definitions provided in connection with special question number 1, the jury was required to find and did find that TXI was negligent; the only theory of negligence presented was that TXI breached the statutory duties imposed upon it under the Federal Motor Carrier Safety Act ("FMCSA" or "the Act") to investigate Rodriguez's driving experience, qualifications, and competency to drive a tractor-trailer. *Accord Shupe,* 192 S.W.3d at 579 (holding harmless any error in submission of negligent hiring and negligent entrustment claims asserted against two different defendants in single broad-form negligence question); *cf. Rosell,* 89 S.W.3d at 655–56 (stating that no harm occurred from trial court's submission of separate liability questions for negligence and for negligent entrustment and hiring, although broad-form questions are mandatory when feasible).

Appellants argue that submission of the "instruction" that they claim they requested was mandated by *Builders Transport, Inc.,* 167 S.W.3d at 10. But in *Builder's Transport,* the plaintiffs asserted both a negligent entrustment claim—which the court recognized required a finding that Builder's Transport knew or should have known of the incompetency of the driver to whom it entrusted the vehicle—and a negligent training claim that the court explained was really a negligent undertaking claim and did not require a knew-or-should-have-known finding. *Id.* The court held that, because these theories were combined in a broad-from submission, and "because [the plaintiffs'] negligence theories do not all require a finding on this factual predicate, we will sustain Builders Transport's second issue only in part." *Id.* at 8. But here, only a single theory of direct liability was asserted against TXI, negligent hiring. A negligent entrustment claim—which would have required a knew-or-should-have-known finding—was not asserted against TXI. And the separate negligent entrustment question submitted concerning Melendez's alleged negligent entrustment of the gravel truck to Rodriguez contained such an instruction. For these reasons, the holdings of *Builders Transport* are inapplicable here.

We overrule Appellants' issue V, subpart A.

## C. Submission of Broad–Form Liability Special Questions

In issue V, subpart B, Appellants claim that the trial court erred by submitting broad-form questions on liability for compensatory damages because the jury could have predicated its findings that Rodriguez, Melendez, and TXI were negligent on the fact that "Rodriguez had an improperly obtained driver's license or because he was an illegal alien who should never have been hired." Appellants argue that "[t]hese theories are invalid under Texas law because there is no causal relation between safe driving and being an illegal alien or using a false social security number to obtain a driver's license" and requested instructions that the jury not consider these facts in assessing negligence.

 Being an illegal alien or having a fraudulent driver's license however are simply facts, not theories of liability. The supreme court, as well as this court, has held that granulated submission of each fact or piece of evidence is not required in a broad-form negligence special question. *See Bed, Bath & Beyond v. Urista*, 211 S.W.3d 753, 757 (Tex.2006) (explaining that when a broad-form liability question submits only a negligence theory, *"Casteel's* multiple-liability-theory analysis does not apply"); *Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429, 434 (Tex.2005) (explaining that "under broad-form submission rules, jurors need not agree on every detail of what occurred so long as they agree on the legally relevant result" so that "jurors may agree that a defendant failed to follow approved safety practices without deciding each reason that the defendant may have failed to do so"); *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 858–59 (Tex.App.-Fort Worth 2003, pet. denied) (declining to require submission of limiting instructions concerning specifically pleaded negligent acts within a single broad-form submission of a negligence theory of liability). Thus, we hold that the trial court did not abuse its discretion by refusing to submit granulated issues or the limiting instructions Appellants requested in connection with special question number 1. *See, e.g., Middleton*, 982 S.W.2d at 470.

We overrule Appellants' issue V, subpart B.

## D. Refusal to Submit Unavoidable Accident Instruction

In issue V, subpart C, Appellants argue that the trial court erred by refusing to submit an unavoidable accident instruction based on the testimony of defense expert Charles Gold. As we have previously mentioned, Gold testified before the jury by deposition that he had examined the remains of the left rear Yukon tire and had concluded that the "left rear tire failed in service from a road hazard type cut" that was ten to eleven inches long created by a "relatively sharp" stationary object on the highway.[41] Gold thus opined that the Yukon's left rear tire had run over something and had suffered a blowout before the sideswipe collision with the TXI truck. On cross-examination, Gold testified that the only equipment he used to examine the tire were a camera and a light. He agreed that he could point to no evidence of any object in the roadway that the Yukon impacted before it hit the gravel truck and conceded that no markings existed on the

---

41. As previously mentioned, both of Appellants' accident reconstruction experts, John Painter and Lee Jackson, as well as Appellees' accident reconstruction expert, Marshek, all testified, however, that there was no evidence of a tire blowout on the Yukon prior to the collision between the Yukon and the gravel truck.

highway from the Yukon's tire rim prior to the Yukon's impact with the gravel truck. Although the trial court refused to submit an unavoidable accident instruction, it did submit a sudden emergency instruction.[42]

■ An unavoidable accident is "an event not proximately caused by the negligence of any party to it." *Dillard*, 157 S.W.3d at 432; *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex.1995). A sudden emergency occurs when the occurrence is caused by something other than the defendant's negligence and arises suddenly. *Dillard*, 157 S.W.3d at 432. The purpose of both an unavoidable accident instruction and a sudden emergency instruction is to advise the jurors, in the appropriate case, that they do not have to place blame on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident in question. *Id.; see also Reinhart*, 906 S.W.2d at 472.

■ The trial court has considerable discretion to determine the necessary and proper jury instructions. *In re V.L.K.*, 24 S.W.3d at 341. "When the trial court refuses to submit a requested instruction, the question on appeal is wheth-

er the requested instruction was reasonably necessary to enable the jury to render a proper verdict." *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000); *see also* Tex.R. Civ. P. 277.

■ Here, the sudden emergency instruction submitted by the trial court enabled Appellants to make the same argument that they claim they would have made if an unavoidable accident instruction had been given: that Kim's Yukon experienced a blowout causing her to lose control and veer suddenly into the oncoming westbound lane of traffic where Rodriguez was driving and that Rodriguez, confronted by the oncoming, out-of-control Yukon, steered to the right towards the shoulder in an effort to avoid a collision. In fact, during closing arguments Appellants made just this argument.[43] Because the trial court's charge adequately informed the jury about Appellants' inferential rebuttal defense and because Appellants actually made the argument that they now claim they should have been entitled to make, we cannot hold that the trial court abused its discretion by not submitting a more elabo-

---

42. The jury was instructed,

If a person is confronted by an "emergency" arising suddenly and unexpectedly, which was not proximately caused by any negligence on his or her part and which, to a reasonable person, requires immediate action without time for deliberation, his or her conduct in such an emergency is not negligence or failure to use ordinary care if, after such emergency arises, he or she acts as a person of ordinary prudence would have acted under the same or similar circumstances.

43. Appellants' counsel argued,

This is Question No. 1.

I believe the answer that you should give, based on the evidence you've heard is "No," "No," and "Yes."

I don't know why the Yukon was in our lane of traffic.

There's testimony from an expert that's examined hundreds of tires that says it might have been a blowout.

There's testimony from Cody Jobe about things said by Ridardo Rodriguez right after the accident that suggests it might have been a blowout.

I couldn't help but notice that there's a big cut on the back left tire that you can see, and there's photographs of the right tire, the front

Excuse me.

the front left tire that you will also see that have a big cut in them.

If the contact with the left-with the fourth axle is the blowout that people heard, that caused the cut on the front left tire, where did this cut come from?

This is an explanation based on some expert witness testimony that might explain why the Yukon was in the wrong lane.

rate, granulated charge that would have also submitted an unavoidable accident inferential rebuttal instruction. *See Dillard*, 157 S.W.3d at 434 (holding that unavoidable accident instruction adequately placed defendant's sole proximate cause inferential rebuttal defense before jury and reversing court of appeals' holding to the contrary). Nor can we hold that, under the circumstances presented here, Appellants' unavoidable accident instruction was reasonably necessary to enable the jury to render a proper verdict. *See Mandlbauer*, 34 S.W.3d at 912. We overrule Appellants' issue V, subpart C.

### E. Submission of Gross Neglect Instead of Malice

 In issue V, subpart D, Appellants claim that the trial court erred by charging the jury on "gross neglect" instead of "malice" in the exemplary damages questions. Although special questions numbers 21 and 22 used the term "gross neglect" instead of "malice," the definition of gross neglect provided to the jury in connection with these questions was, in fact, the then statutory definition of malice. *See* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (amended 2003) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7) (Vernon Supp. 2006)) (defining "malice" as an act or omission which, when viewed objectively from the standpoint of the actor at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which the actor had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others). Because the special questions submitted to the jury required the jury to weigh the evidence against the correct, statutory definition of malice, although labeled "gross neglect," we hold that the

trial court's error, if any, did not cause the rendition of an improper judgment. *See, e.g., Shupe*, 192 S.W.3d at 579.

We overrule Appellants' issue V, subpart D.

## IX. Sufficiency of the Evidence

In their issue III, subparts A and B, Appellants claim that legally and factually insufficient evidence exists supporting the jury's findings that Rodriguez was negligent, that TXI negligently hired Rodriguez or that Melendez negligently entrusted the truck to Rodriguez. In their issue IV, subparts A, B, and C, Appellants claim that the evidence is legally and factually insufficient to establish that Rodriguez acted with malice, that a malice finding against Rodriguez may be imputed to TXI, or that TXI is independently liable for exemplary damages.

### A. Standards of Review

#### 1. Legal Sufficiency Standard

A legal sufficiency challenge may be sustained only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence con-

trary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

### 2. Factual Sufficiency Standard

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

### 3. Standard for Legal Sufficiency Review of Finding Required to be Supported by Clear and Convincing Evidence

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac. & Rem. Code Ann § 41.001(2) (Vernon Supp.2006); Tex. Fam. Code Ann § 101.007 (Vernon 2002) *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex.1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979). While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

This higher burden of proof elevates the appellate standard of legal sufficiency review. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 622, 625 (Tex.2004). In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that its finding was true. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must review all the evidence in the light most favorable to the finding. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must consider, however, undisputed evidence even if it is contrary to the finding. *City of Keller*, 168 S.W.3d at 817; *Hall*, 168 S.W.3d at 170. That is, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 827.

If we determine that no reasonable fact-finder could form a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally insufficient. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. Generally, we must then reverse and render judgment. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see* Tex.R.App. P. 43.3; *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex.1986).

### B. The Jury's Finding that Rodriguez was Negligent

The jury found that Rodriguez's negligence proximately caused the occur-

rence in question. In issue III, subpart A, Appellants claim that the evidence is legally and factually insufficient to support this finding. Appellees' theory of the case was that Rodriguez was negligent by driving the gravel truck wholly or partially in the wrong, westbound lane of traffic.[44] The following evidence supports the jury's finding that Rodriguez was negligently driving wholly or partially out of his lane of traffic and in the wrong, westbound lane of traffic.

- The testimony of Lee Jackson, Trooper Wanda Raney, and Kurt Marshek that the gouge mark (located approximately one foot inside the westbound lane) was the point of impact between the vehicles.

- Marshek's testimony that the point of impact between the vehicles could not have occurred at the location of the gouge mark if Rodriguez had been traveling in his proper lane of traffic. Marshek explained that if the gravel truck was traveling eastbound wholly within the eastbound lane of traffic and Rodriguez and had steered to the right for one to three seconds, as Rodriguez testified he did,[45] the gravel truck would not have been near the gouge mark. It would have been at least six feet south of the gouge mark toward the eastbound shoulder of Highway 114.

- Marshek's testimony and exhibits explaining that when the Yukon hit the gravel truck on its second axle (photos show damage to the gravel truck's second axle wheel) it was forced—because of the TXI truck's massively greater weight—into traveling the direction of the gravel truck's trailer. The gouge mark therefore represented the angle that the TXI trailer was traveling back towards its proper lane of traffic as Rodriguez steered to the right before impact. Lining the TXI trailer up with the angle of the gouge mark, the trailer physically had to have been over the center stripe due to its length.

- Jackson's concession that if the gravel truck was traveling at the angle of the gouge mark, the trailer would had to have been over the center line.

- The fact that Cody Jobe was ahead of the gravel truck driven by Rodriguez and was using the right shoulder as a turn lane to turn into his father's driveway. Appellants' expert John Painter testified that the "drive-through" video[46] showed that Highway 114 declines slightly as it approaches Jobe's driveway and the point of impact. Painter admitted that he had observed vehicles move across the center line to avoid and give a wide berth to a car slowing ahead to make a right-hand turn.

- Marshek's testimony concerning the 358 feet of skid marks made by the TXI truck as it braked and came to rest on the shoulder of Highway 114.

44. No evidence exists of any other negligence by Rodriguez, such as that he was speeding or had consumed drugs or alcohol.

45. Rodriguez consistently testified that he steered right prior to impact in an effort to avoid the accident. His testimony concerning the length of time he steered right varied from one second to three seconds.

46. During Appellants' direct examination of Painter, they showed the jury Defense Exhibit 430, a videotape referred to in the record as a "drive-through" video of Highway 114, documenting the highway prior to, at, and after the location of the collision. This exhibit was not, however, tendered to the court reporter, and in response to our request for it, the court reporter has stated by letter that despite his request for it, no party had been able to locate it or provide it to him.

Marshek testified and showed the jury diagrams explaining that if the TXI truck was across the center line, its skid marks could have been made during a smooth steering maneuver to the right—as Rodriguez testified he performed—but if the TXI truck was centered in its own lane of travel, in order to line up with the skid marks on the highway, after steering right Rodriguez would have had to perform a sharp turn to the left towards the center line and then a sharp turn back to the right.

- Painter's testimony concerning the line-of-sight analysis he performed. Painter performed a line-of-sight analysis from the viewpoint of the passenger in the Ford pickup traveling behind the TXI truck and testified that if the gravel truck had been in its proper lane, the Yukon should have been visible to the passenger in the Ford pickup, George Wilton. Wilton testified, however, that he never saw the Yukon until it spun off the rear of the TXI trailer; Wilton said the TXI trailer blocked any view of the Yukon. When Wilton first saw the Yukon, it was in its own, proper lane.

- Painter's analysis of the information provided by the Yukon's SDM and Painter's and Marshek's testimony concerning the fake-left syndrome. Painter testified that a driver's braking reaction time in response to external stimuli is approximately 1.5 seconds. He testified that the SDM recorded the speed of the Yukon for the five seconds prior to airbag deployment, which he agreed would occur at impact. That data showed that Kim initially took her foot off the gas—"throttle release"—and then applied the brakes. Painter performed mathematical calculations that established that, when Kim was making a decision to apply the brakes at approximately two seconds prior to impact (the gouge mark being the point of impact), the Yukon was between 160 and 200 feet east of Jobe's driveway. Marshek testified, and apparently the "drive-through video" showed, that a creek bed and trees lined the right shoulder of the westbound side of Highway 114 approximately 180 to 200 feet before Jobe's driveway. Thus, according to Marshek, Kim was confronted with a split-second decision of whether she should steer left or steer right to avoid a head-on collision with the gravel truck approaching her at least partially in her lane of traffic. Painter explained that chapter 64 of a traffic accident reconstruction book, which he recognized as authoritative, discussed the "fake-left syndrome" and that the syndrome may occur when a driver is confronted by a vehicle approaching "in your lane at a rapid rate." "Now you must try to guess what it will do." Painter agreed that this was the scenario that Jackson, Appellants' first expert, and Marshek believed Kim had confronted.[47]

---

**47.** Appellants claim that the case of *Wells v. Texas Pacific Coal & Oil Co.,* 140 Tex. 2, 164 S.W.2d 660, 663 (Tex.1942), establishes that the "fake-left" testimony is "conjecture" and is based on impermissible inference stacking. The impermissible inference stacking present in *Wells* is not, however, present here. Here, both Marshek and Painter recognized and testified concerning the "fake-left syndrome"; Painter read information to the jury about the "fake-left syndrome" from a traffic reconstruction book that he agreed was authoritative. Thus, the analysis utilized in *Wells* is not applicable to the direct accident reconstruction expert testimony admitted here.

The following testimony and evidence impeaches or undermines the testimony and evidence set forth above. It is contrary to the jury's finding that Rodriguez negligently drove the gravel truck across the center line. For the purposes of our legal sufficiency review, we have also set forth how this contrary testimony and evidence was challenged or impeached by Appellees so that we may attempt to determine whether a reasonable juror could have disregarded it. *See City of Keller*, 168 S.W.3d at 827.

- Rodriguez's testimony that he did not cross the center line. Rodriguez's credibility was impeached; he lied on his job application by stating that he had the legal right to work in the United States and by falsifying his employment record; he also obtained a commercial driver's license by creating a fake social security number for himself.

- Cody Jobe's testimony that he did not see the TXI truck out of its lane and that he would have told DPS troopers at the scene if he had. But Jobe also testified that he made just a "quick glance" into his rearview mirror prior to turning right into the driveway and did not form an impression one way or the other as to whether the gravel truck was out of its lane of traffic.

- Jerry Larance's testimony that he was following the gravel truck and that he saw it in its proper lane when the collision occurred. On cross-examination, however, Larance testified that he did not see the Yukon before it spun off the back of the gravel truck and was not looking "that far down the road" until he heard the collision between the truck and the Yukon, at which point he looked up. Larance agreed that he had testified six times during his deposition that he did not see the gravel truck at all until the noise of the sideswipe collision at issue here caused him to look down the road. Larance conceded that if the gravel truck had moved to the right before he looked up and saw it, that would mean that the gravel truck was over the center line when it started its movement to the right.

- George Wilton's testimony that he did not see the gravel truck out of its lane. He also testified however that he never saw the Yukon out of its lane either until it swerved in front of Larance's truck. He said he could not see the Yukon until it came off the back of the TXI trailer because the trailer was blocking the Yukon from view.

- Michelle Wyndham's testimony that she did not see the gravel truck out of its lane. On cross-examination, Wyndham testified that she did not see the TXI truck at all until after the collision between the Yukon and the Ford pickup in front of her.

- John Painter's testimony and opinions contradicting some of Marshek's testimony and opinions.[48] Painter testified that, based on his testing and "Engineer Dynamics Vehicle Trailer Simulator" program results,[49] the gravel

---

48. The direct examination of Appellants' expert Painter is exceptionally hard to follow. The majority of the questions asked and the answers provided involve blowups on the "Elmo" of certain portions of exhibits; we cannot view the blowups or, in some instances, even discern what portion of the exhibit was being enlarged. Additionally, a laser pointer was utilized extensively during the examination by counsel and by Painter. The court reporter's "(indicating)" notation in the record as the laser pointer was used provides us with no clue as to the portion of the exhibit that was being discussed.

49. The "Engineer Dynamics Vehicle Trailer Simulator" program is a computer program;

truck could have made the steer right and then quick-left maneuver necessary to line up with the skid marks it made as it came to rest on the shoulder. Painter opined that an oversize dimple in the right front bumper of the Yukon showed that the Yukon had struck the front left bumper of the gravel truck and that therefore the angle of the collision between the vehicles was a three degree angle, not a twelve degree angle as Marshek had testified. Marshek had testified that a less than five degree angle of impact between the vehicles would not have generated enough force to cause the damage that occurred to the steel wheel of the gravel truck. Painter testified that Marshek had failed to factor in the yaw of the Yukon's rear tires; Marshek testified there would have been very little yaw because there was very little weight on the Yukon's rear tires for two reasons— because the Yukon was braking hard and because the front end of the Yukon was being forced downward as it went partially under and engaged with the gravel truck. Painter testified that the Yukon clipped the gravel truck's front left clearance pole; Marshek said that it did not and testified that the clearance pole came off during the gravel truck's rapid deceleration because the pole was being held on by only one clip. Finally, Painter conceded that if Rodriguez drove to the right for 1.4 seconds prior to impact, he would necessarily have been six feet over the center line in the westbound lane of traffic when he started this 1.4 second maneuver to the right.

• The testimony of Kennemer, the transportation manager for TXI and its corporate representative during trial, that the point of initial impact between the vehicles was the front left edge of the gravel truck. According to Kennemer, the Yukon hit the gravel truck's left front clearance pole and knocked it off.

Considering all of the evidence favorable to the finding that Rodriguez was at least partially across the center stripe in the wrong, westbound lane of traffic at the time of the accident and disregarding all contrary evidence that a reasonable factfinder could, more than a scintilla of evidence exists supporting the jury's finding. *See City of Keller,* 168 S.W.3d at 827. Due to the battle of the recontructionist experts that the jury heard in this case, a reasonable fact-finder could have disregarded the three conflicting theories of how the accident occurred that were propounded by the Appellants' three experts, Painter, Jackson, and Gold. We hold that the evidence is legally sufficient to support the jury's finding in special question number 1 that Rodriguez was negligent. *See id.*

In addition, considering all of the competing evidence, the evidence supporting the jury's finding in special question number 1 that Rodriguez was negligent is not so weak nor is the evidence to the contrary so overwhelming that the jury's answer should be set aside and a new trial ordered. *See, e.g., Garza,* 395 S.W.2d at 823; *Morrell v. Finke,* 184 S.W.3d 257, 282 (Tex.App.-Fort Worth 2005, pet. abated) (recognizing that in a battle of competing experts, it is the obligation of the jury to determine the credibility of the witnesses and to weigh their testimony). We hold that the evidence is factually sufficient to

Painter input data and the program generated results. The entry of different data generated

different results.

support the jury's finding in special question number 1 that Rodriguez was negligent.

We overrule Appellants' issue III, subpart A.

## C. The Jury's Findings that TXI Negligently Hired Rodriguez and that Melendez Negligently Entrusted the Truck to Rodriguez

In their issue III, subpart B, Appellants claim that legally and factually insufficient evidence exists to impose nonvicarious, direct liability against the truck owner, Aurelio Melendez, and the truck lessee, TXI. Appellees presented their negligent hiring claim against TXI and their negligent entrustment claim against Melendez primarily through the testimony of Arthur Bensmiller, a motor carrier safety regulations expert, the testimony of Jonathan Kennemer, TXI's transportation manager, and the testimony of Melendez.

Bensmiller testified that Texas had adopted the FMCSA, so motor carriers in Texas—including TXI—are required to comply with it. According to Bensmiller, TXI was an authorized for-hire interstate motor carrier and under the Act Rodriguez was TXI's employee, operating TXI's leased truck. Bensmiller testified that the Act requires that motor carrier drivers possess certain qualifications and that the FMCSA specifically requires a motor carrier to conduct an investigation and to make inquiries with respect to each driver that it employs. *See* 49 C.F.R. § 391.23 ("each motor carrier *shall* make the following investigation and inquiries with respect to each driver it employs") (emphasis added). Under the Act, prospective motor carrier employers "*must investigate, at a minimum, the information listed in this paragraph from all previous employers of the applicant* that employed the driver to operate a CMV within the previous three years." *Id.* § 391.23(d) (emphasis added).

Bensmiller explained that Rodriguez's employment application, Plaintiffs' Exhibit 1, contained numerous obvious falsifications that TXI was statutorily required to investigate and should have noticed. First, Rodriguez wrote on his application that he had previously worked for twenty months for Aggregate Haulers; but Aggregate Haulers provided a written response to TXI's query indicating that Rodriguez had been employed there for less than four months. Second, Rodriguez wrote on his application that he had previously worked for Coronado Trucking from May 1994 through February 1996. But a driver's record service report ordered by TXI showed that Rodriguez had first obtained a commercial driver's license on May 20, 1996. Because it is illegal to drive a motor carrier without a commercial driver's license, Bensmiller testified that TXI should have realized from the information it possessed that Rodriguez could not have driven for Coronado Trucking from May 1994 through February 1996 as he had represented. Bensmiller testified that based on the information provided by Rodriguez in his application and the information TXI received back from its statutorily required inquiries, it was clear that "[t]he application contained false and incomplete information," but nonetheless TXI failed to follow up on or further investigate the false information provided by Rodriguez.

The application also contained a specific question asking whether Rodriguez "had the legal right to work in the United States." Rodriguez answered "Yes" on the application. But information forwarded to TXI from the United States Immigration Services and Homeland Security Service expressly stated that Rodriguez did not have the legal right to work in the United States. Exhibits introduced into

evidence established that Rodriguez had previously been deported.

Finally, Rodriguez acknowledged that he had fabricated a social security number and had used it to obtain a commercial driver's license.[50] Bensmiller testified that because Rodriguez had fraudulently obtained a Texas Class A commercial driver's license, he did not satisfy the statutory "have a valid driver's license" requirement necessary to qualify to drive a motor carrier under federal laws.[51] *See* TEX. TRANSP. CODE ANN. § 522.021(a)(4) (Vernon 1999) (requiring applicant for commercial driver's license to provide applicant's social security number, unless the application is for a nonresident commercial driver's license [Rodriguez indicated he was a U.S. resident] and the applicant is a resident of a foreign jurisdiction); *see also* 49 C.F.R. § 391.11(b)(5) (2005) (requiring motor carrier driver to have valid commercial driver's license). Bensmiller testified that "Mr. Rodriguez did not have a valid Texas, commercial driver's license, Class A, to operate a truck tractor, semi-trailer for the TXI Transportation Company at the time of the accident." Bensmiller testified that his opinion—based on his experience and training in the field of trucking regulation, compliance, and enforcement and on the documents that TXI possessed concerning Rodriguez—was that TXI should not have allowed Rodriguez to drive a tractor-trailer under its authority on December 17, 2002.

On cross-examination, Bensmiller agreed that Rodriguez had a state-issued commercial driver's license from 1996 until the time of the accident. Bensmiller conceded that he was not aware of a single motor vehicle record check run by TXI on Rodriguez that showed Rodriguez's commercial driver's license was not in effect. Likewise, Bensmiller agreed that in 1996 Rodriguez passed the "skills test" with exceptions and, on the second try, the "knowledge test" necessary for issuance of a commercial driver's license. Bensmiller testified that Rodriguez was rated bad and fair on a couple of items during the skills test, although he passed. Subsequently, in May 2001, Rodriguez sought a "reinstatement" of his license and again needed two attempts to pass the "knowledge test." Finally, Bensmiller agreed that no specific provision in the Act requires a motor carrier to check the social security number of its driver applicants.

Jonathan Kennemer was head of safety and compliance for TXI. He testified that both trucks that TXI leased and trucks that TXI owned fall under the same FMCSA standards. Likewise, drivers of trucks leased by TXI and drivers of trucks owned by TXI are treated the same. He conceded that Rodriguez's application was inaccurate and that TXI had received materials back from its statutorily required queries establishing these inaccuracies. Kennemer testified that he had never considered that Rodriguez might be lying about how the accident occurred and did not think Rodriguez crossed the center line or made any driving mistake that would have caused the accident. Kennemer testified that at the time of trial, despite what he had learned during the depositions and discovery in this case concerning Rodriguez's social security number and commercial driver's license, Rodriguez was still driving for TXI. Kennemer testified that, at the time of trial, he believed Rodri-

---

**50.** Appellees also offered into evidence an interrogatory answer provided by Rodriguez indicating that he did not have a social security number.

**51.** Trooper Raney likewise testified that Rodriguez could not meet the eligibility requirements to obtain a commercial driver's license if he did not have a social security number.

guez was qualified to drive a commercial motor vehicle in the State of Texas.

Kennemer conceded that TXI had obtained photocopies of all of Melendez's drivers' social security cards, except Rodriguez's. Appellees offered copies of the TXI files on these drivers showing the photocopies of their social security cards that TXI had made.

### 1. Negligent Hiring

■ For negligent hiring, a plaintiff must prove that (1) the employer owed a legal duty to protect the employee's actions and (2) the third party's sustained damages were proximately caused by the employer's breach of that duty. *Bedford,* 166 S.W.3d at 463. Concerning the second element, if the injury was not the foreseeable result of the employment, the employer is not liable for the injury under a negligent hiring theory. *See* 1 JAMES B. SALES & J. HADLEY EDGAR, TEXAS TORTS AND REMEDIES § 4.01[4][c] (2005).

Appellants argue that no evidence exists that any negligence of TXI in hiring Rodriguez was a proximate cause of the accident. Appellants claim that, at most, Appellees proved that Rodriguez should not have been hired to drive the gravel truck because he was an illegal alien who had procured a commercial driver's license utilizing a fraudulent social security number. The risks from these unknown, uninvestigated facts, according to Appellants, do not include a the risk that Rodriguez would drive the gravel truck negligently. *Accord NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 953–54 (Tex.1996) (recognizing the injury suffered must be a foreseeable result of the negligent hiring); *see also Geedman v. Rush Transp., Inc.,* No. 01–

98–01102–CV, 2000 WL 704978, at \*3 (Tex. App.-Houston [1st Dist.] June 1, 2000, no pet.) (op. on reh'g) (not designated for publication). We agree with Appellants that neither Rodriguez's status as an illegal alien or his use of a fake social security number to obtain a commercial driver's license created a foreseeable risk that Rodriguez would negligently drive the gravel truck. *Accord Guidry,* 944 S.W.2d at 811 (upholding summary judgment on plaintiffs' negligent hiring claim because truck company owed no duty to public to protect from truck driver's sexual assault).[52]

We next address the more difficult issue of whether TXI's decision to hire Rodriguez—despite its knowledge of Rodriguez's misrepresentations on his employment application and despite the information TXI received back from its queries—constituted the breach of a legal duty owed by TXI to the general public and whether Appellees' damages were proximately caused by that breach. *See Bedford,* 166 S.W.3d at 463. Rodriguez's application for employment was admitted into evidence as Plaintiff's Exhibit 1, and under the "employment history" section, Rodriguez indicated that he had worked: from April 2000 until May 2001 for Sixto Quezada and Aggregate Haulers in Lancaster; from October 1999 to April 2000 for Pedro Guerra and Aggregate Haulers in Dallas; from July 1997 to October 1999 for Hermilo Jasso in Grand Prairie; from January 1997 to July 1997 for Edward Saldana Trucking in Grand Prairie; from February 1996 to January 1997 for Data Documents in Hutchins; and from May 1994 to February 1996 for Coronado Trucking Company in Dallas. Thus, Rod-

---

**52.** Appellants offered much evidence controverting this aspect of Appellees' negligent hiring claim. But because no causal nexus exists between Rodriguez's illegal alien status or his use of a fake social security number and the negligence finding against him, it is unnecessary for us to detail all of that evidence here.

riguez's application appears to show approximately six uninterrupted years of truck driving experience—from May 1994 through the date of his application, May 18, 2001.

But in fact, according to Aggregate Haulers, Rodriguez worked for that company for about four months, from March to June 2000, not for approximately twenty months as reflected on Rodriguez's application. Bensmiller testified, and Rodriguez and Kennemer agreed, that Rodriguez first obtained a commercial driver's license in May 1996; thus, Bensmiller explained that, because Rodriguez had not yet obtained a commercial driver's license, Rodriguez could not have driven for Coronado Trucking from May 1994 to February 1996. And Rodriguez admitted he that he had never driven for Data Documents; he fabricated that prior employment and any query to that company would have revealed this fact. If the remaining employment history on Rodriguez's application is true, Rodriguez had only about three years of repeatedly interrupted experience as a truck driver for the six years from May 1996 through the date of his employment application with TXI, instead of six years of continuous employment as a driver as he had represented on his application.[53]

Concerning TXI's legal duty to the public, Kennemer testified that it was TXI's responsibility to make sure that its drivers were qualified, experienced, and safe; the drivers use TXI's Department of Transportation number. He agreed that the FMCSA requires motor carriers to conduct an investigation and to make inquires with respect to each driver that it employs. *See* 49 C.F.R. § 391.23, .23(d).

Thus, we hold that TXI owed a legal duty to the public to adequately investigate Rodriguez's qualifications to drive the gravel truck. *See id.; see also Morris,* 78 S.W.3d at 50 (recognizing motor carrier has a duty, in qualifying the drivers who would transport materials for it, to take reasonable precautions to prevent injury to the public by those drivers).

Despite this duty, Kennemer admitted that TXI knew the employment history section of Rodriguez's application was "incomplete; I don't know if he lied on it purposely, but it was—it was incorrect." Kennemer also admitted that when a truck driver changes jobs every few months, his "employability usually is not good." And finally, Kennemer said that TXI did not train Rodriguez; it relied upon his experience as represented in his application. Bensmiller testified that based on the information provided by Rodriguez on his application and the information TXI received back from its required inquiries, TXI should have known that the application contained false and incomplete information, yet TXI failed to further investigate or to seek clarification of the inaccurate information Rodriguez provided. Bensmiller testified, "[W]hen his application came back like this, you let him go." We hold that legally and factually sufficient evidence exists that TXI's decision to hire Rodriguez, despite its knowledge of Rodriguez's misrepresentations, constituted the breach of the legal duty TXI owed to the general public.

The remaining question is whether TXI's breach of its duty to investigate Rodriguez's employment history and expe-

---

**53.** Rodriguez signed his application under the statement,

> This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to

the best of my knowledge.... In the event of employment, I understand that false or misleading information given in my application or in interview(s) may result in discharge.

rience to drive a tractor-trailer was a proximate cause of Appellees' injuries. According to Bensmiller, Rodriguez was not qualified to drive a motor carrier; "[h]e was unqualified by virtue of 391.11B(3)," which required him to have sufficient training and experience to be able to operate the equipment that he was assigned in a safe manner. *See* 49 C.F.R. § 391.11(b)(3). Bensmiller testified that Rodriguez should not have been hired. "He should not have been behind the wheel; the motor carrier should have prevented it."

Although we have located no case directly on point, the facts of this case are more akin to the facts of the negligent hiring cases supporting a proximate cause finding than to the facts of those cases holding that the condition that made the hiring negligent was not the same condition that caused the injuries. *Compare Morris,* 78 S.W.3d at 51–52 (holding in summary judgment proceeding that motor carrier's failure to comply with Act's requirement that it obtain a copy of driver's DPS driving report constituted some evidence raising a fact issue concerning whether carrier exercised reasonable care in qualifying driver and whether carrier should have anticipated the risk by the failure to exercise this care); *and Deerings West Nursing Ctr. v. Scott,* 787 S.W.2d 494, 496 (Tex.App.-El Paso 1990, writ denied) (holding that negligent hiring of unlicensed nurse who had fifty-six convictions for theft—that licensing process would have vetted—was a proximate cause of injury to elderly person by nurse); *and Estate of Arrington,* 578 S.W.2d at 173 (holding employer liable for negligently hiring employee who had a long criminal record for position of armed security guard); *with Brown v. Swett & Crawford of Tex., Inc.,* 178 S.W.3d 373, 384 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (holding negligent hiring claim fails for want of causation when no evidence

exists of underlying tort by employee); *and Houser v. Smith,* 968 S.W.2d 542, 544 (Tex.App.-Austin 1998, no pet.) (holding employer not liable on negligent hiring theory for after-hours criminal act of employee); *and Guidry,* 944 S.W.2d at 811 (holding truck company not liable for driver's sexual assault on victim because company owed no duty to public from this risk); *see also Mireles v. Ashley,* 201 S.W.3d 779, 783–84 (Tex.App.-Amarillo 2006, no pet.) (reversing trial court's summary judgment for employer on negligent hiring claim). Here, the very issue that TXI was statutorily required to investigate "at a minimum" prior to hiring Rodriguez was his prior truck-driving experience. *See* 49 C.F.R. § 391.23(d). The jury reasonably could have determined that this condition, Rodriguez's lower-than-represented level of experience in driving a tractor-trailer and TXI's consequent decision to not train Rodriguez based on his misrepresented level of experience, was the same condition that proximately caused Appellees' injuries.

Viewing all of the evidence that reasonable fact-finders could consider that is favorable to the finding that TXI negligently hired Rodriguez and disregarding the contrary evidence that reasonable fact-finders could disregard, we hold that the evidence is legally sufficient to support the jury's finding in special question number 1 that TXI was negligent in hiring Rodriguez. *See City of Keller,* 168 S.W.3d at 827.

Considering all of the competing evidence, the evidence supporting the jury's finding in special question number 1—that TXI's negligent hiring of Rodriguez proximately caused the occurrence in question—is not so weak nor is the evidence to the contrary so overwhelming that the jury's answer should be set aside and a new trial ordered. *See, e.g., Garza,* 395 S.W.2d at 823. Likewise, factually suffi-

cient evidence exists that the condition that made Rodriguez's hiring negligent—the questionable amount of experience that he had operating a tractor-trailer and TXI's reliance on Rodriguez's inaccurate prior employment to decline to further train him—constitutes a proximate cause of Rodriguez's negligence in driving across the center stripe and that this driving error was foreseeable by TXI in light of Rodriguez's spotty employment record and lack of training by TXI. We hold that the evidence is factually sufficient to support the jury's finding that TXI's negligent hiring of Rodriguez proximately caused the occurrence in question.

We overrule Appellants' issue III, subpart B as it concerns TXI.

## 2. Negligent Entrustment

 Also in issue III, subpart B, Appellants claim that no evidence or factually sufficient evidence exists to support the jury's finding that Melendez negligently entrusted the truck to Rodriguez.[54] The elements of a cause of action for negligent entrustment of a vehicle are (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed, incompetent, or reckless; (4) the driver was negligent on the occasion in question; and (5) the driver's negligence proximately caused the accident. *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987); *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 571 (Tex.1985). Knowledge of the driver's incompetency at the time of the entrustment is an essential element to establish negligence. *Briseno v. Martin*, 561 S.W.2d 794, 796 n. 1 (Tex.1977).

 Aurelio Melendez testified that he owned seven trucks and employed six drivers. Melendez said that he did not know anything about the FMCSA. According to Melendez, in May 2001, Rodriguez filled out an application for employment with Melendez to drive for TXI; Melendez forwarded the application to TXI and gave Rodriguez a "road test," which he passed. Although the regulations require the person who gave the road test to complete a certificate of the driver's road test, Melendez did not fill out the required form. Melendez nonetheless testified that he signed a "sheet" indicating that he had given Rodriguez a road test and that Rodriguez had passed. Melendez testified that he was never made aware that Rodriguez's license was invalid; Rodriguez presented a facially valid commercial driver's license and had no prior negative driving history. ·

We have carefully and thoroughly reviewed the record, and we hold that legally insufficient evidence exists to establish the third element of Appellees' common law negligent entrustment claim: that Melendez knew or should have known that Rodriguez was an unlicensed, incompetent, or reckless driver. Rodriguez's application—although false—indicated that he had six solid years of truck driving experience. Rodriguez possessed a facially valid Texas commercial driver's license. No evidence exists that Rodriguez had a negative driving record or had been involved in any accidents before he applied with Melendez to be a driver for TXI. Although with respect to Rodriguez, Melendez failed to follow his usual procedure of obtaining a copy of his driver's social security number, this fact alone does not support an inference by a reasonable fact-finder that Melendez knew or should have known that

---

**54.** While TXI's duties stem from the FMCSA, any duties owed by Melendez are based on the common law. The statutory FMCSA duties do not apply to Melendez.

Rodriguez was unlicensed, incompetent, or reckless. *Compare Batte v. Hendricks,* 137 S.W.3d 790, 791–92 (Tex.App.-Dallas 2004, pet. denied) (holding defendant entitled to summary judgment on negligent entrustment claim because no issue of fact existed as to whether the defendant knew or should have known that the driver was an unlicensed, incompetent, or reckless driver) *with Montgomery Ward & Co. v. Marvin Riggs Co.,* 584 S.W.2d 863, 866 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.) (holding evidence that defendant driver lacked judgment, suffered from visual and hearing deficiencies, could not handle stressful situations, was slow in learning how to drive a truck, and had previously had his driver's license suspended was sufficient to support finding of gross negligence by owner in entrusting its truck to the driver).

We sustain this portion of Appellants' issue III, subpart B.

■ We note, however, that our ruling on this subpart of Appellants' issue III changes the judgment only by eliminating Melendez's responsibility for any portion of it. TXI stipulated that it was vicariously liable for compensatory damages if the jury found Rodriguez negligent, and the trial court's judgment expressly reflects this stipulation.[55] Because the jury allocated 50% causation against Rodriguez—which TXI stipulated it was vicariously responsible for—and 25% causation directly against TXI,[56] the percentage of responsibility attributable to TXI is 75%. TXI is therefore jointly and severally responsible for all of the compensatory damages as-

sessed by the jury regardless of whether the evidence is insufficient to support the jury's finding that Melendez negligently entrusted the truck to Rodriguez. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.013(b)(1) (Vernon Supp.2006) (providing that when percentage of causation attributable to defendant is greater than 50%, defendant is jointly and severally liable for all compensatory damages).

### D. The Jury's Finding that Rodriguez Acted With Gross Neglect and that Gross Neglect was Attributable to TXI

In issue IV, subpart A, Appellants contend that no evidence exists that Rodriguez acted with gross neglect. In issue IV, subpart B, Appellants claim that any gross neglect by Rodriguez cannot be imputed to TXI. As we previously have discussed, the definition of "gross neglect" given to the jury in this case—the definition of malice set forth in former civil practice and remedies code section 41.001(7)(B)—consists of two components: one objective and one subjective. *See Columbia Med. Ctr. of Las Colinas,* 122 S.W.3d at 854. Objectively, the defendant's conduct must involve an extreme risk of harm, a significantly higher threshold than the objective reasonable person test for negligence. *Transp. Ins. Co.,* 879 S.W.2d at 22. To satisfy the objective malice prong, the defendant's conduct must, viewed objectively from the actor's standpoint, involve an extreme degree of risk. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex.2001). "Extreme risk" means not a remote possibility of

---

55. The parties stipulated that TXI was vicariously liable (pursuant to FMCSA regulations) for compensatory damages proximately caused by Rodriguez. Accordingly, based on the foregoing, the trial court found TXI jointly and severally responsible for all of the damages awarded.

56. The jury allocated 25% causation against Melendez for negligently entrusting the truck to Rodriguez and found that Hughes was not negligent, assessing 0% liability against her.

injury or even a high probability of minor harm but rather the likelihood of serious injury to the plaintiff. *Id.* Subjectively, the defendant must have actual awareness of the extreme risk created by the conduct. *Id.* Indeed, what separates ordinary negligence from gross negligence is the actor's state of mind. *Diamond Shamrock Ref. Co.*, 168 S.W.3d at 173 (quoting *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex.1999)). That is, not only must the actor have actually known of the peril but also his acts or omissions must demonstrate subjectively "that he did not care" about it. *Id.; Lee Lewis Constr. Inc.*, 70 S.W.3d at 785. Evidence of simple negligence is not enough to meet either the required objective or subjective components. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998).

### 1. Gross Neglect by Rodriguez

 Here, no evidence exists that an act or omission by Rodriguez, viewed objectively from his standpoint, involved an extreme degree of risk that Rodriguez was actually, subjectively aware of, but nonetheless disregarded to proceed in conscious indifference to the safety of others. No expert offered an opinion as to whether Rodriguez was grossly negligent or acted with malice. Rodriguez himself repeatedly testified that he steered right in an effort to avoid the collision. We have thoroughly reviewed the record, and there is no evidence that Rodriguez recognized an extreme risk of serious harm but simply did not care. *Accord Rogers v. Blake*, 150 Tex. 373, 240 S.W.2d 1001, 1004 (Tex.1951) (holding that driver's act in running stop sign did not establish gross negligence); *McCarty v. Moss*, 225 S.W.2d 883, 885 (Tex.Civ.App.-Austin 1949, writ ref'd) (holding driver's act of speeding did not establish gross negligence). We hold that no reasonable fact-finder could have formed a firm belief or conviction that

Rodriguez acted with gross neglect. *See Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. Further, because Rodriguez did not act with gross neglect TXI could not have ratified any grossly negligent act by Rodriguez.

We sustain Appellants' issue IV, subparts A and B.

### 2. Gross Neglect Directly by TXI

 In issue IV, subpart C, Appellant's claim that insufficient evidence exists to support the imposition of punitive damages on TXI for negligently hiring Rodriguez. TXI's negligent hiring of Rodriguez does not rise to the level of gross neglect as defined in the court's charge. In *Williams v. Steves Indus., Inc.*, the Texas Supreme Court decided an issue very similar to the one before us. 699 S.W.2d at 574. In *Williams,* the supreme court held that permitting an unlicensed driver-employee to drive did not automatically rise to the level of gross negligence. *Id.* The supreme court explained,

> There are a number of reasons why a driver may not have a valid license. One may be a competent driver and fail to apply for a license, or carelessly allow the license to expire, or have it revoked for failure to report an accident. *Thus, allowing a person to drive without a license creates an unreasonable risk but does not involve such a high degree of risk that a jury could objectively determine that the defendant did not care whether the driver would injure someone.*

*Id.* (emphasis added). Here, there is simply no evidence that Rodriguez, although not possessing the level of driving experience that he had represented and although not in compliance with FMCSA licensing requirements, was such an incompetent driver that TXI was *grossly negligent* in

employing him or retaining him. *See id.* There is no evidence that, viewed objectively from TXI's standpoint, TXI's hiring of Rodriguez—although negligent—also involved an extreme degree of risk of which TXI possessed actual awareness but subjectively disregarded. To the contrary, TXI offered evidence that Rodriguez did not have a negative driving history and that he ultimately satisfied the driving-related criteria necessary to obtain a Texas commercial driver's license.

We sustain Appellants' issue IV, subpart C.[57]

## X. AD LITEM FEES

In their final issue, issue VI, Appellants claim that the trial court erred by awarding fees to the guardian ad litem. Appellants claim that no conflict of interest existed that necessitated the appointment of a guardian ad litem for Jagr Royse and that the time the guardian ad litem spent on the case was not required by any conflict of interest.

### A. Standard of Review and Law

Minors may sue and be represented by "next friend." TEX.R. CIV. P. 44. When an adverse interest arises between the minor and the next friend, the next friend is no longer competent to represent the minor's interests. *See Byrd v. Woodruff,* 891 S.W.2d 689, 704 (Tex.App.-Dallas 1994, writ dism'd by agr.). Former Texas Rule of Civil Procedure 173[58] provided that when a minor is represented by a next friend who appears to the court to have an interest adverse to the minor, the court must appoint a guardian ad litem for the minor. *See* TEX.R. CIV. P. 173, 151–152 S.W.2d (Tex.Cases) xxxii (1941, amended 2005). The Texas Supreme Court has explained that the appointment of a guardian ad litem is appropriate *only* when there is a conflict of interest between the minor and the next friend or guardian. *McGough v. First Court of Appeals,* 842 S.W.2d 637, 640 (Tex.1992) (orig. proceeding); *Davenport v. Garcia,* 834 S.W.2d 4, 24 (Tex.1992) (orig. proceeding).

Former rule 173 authorized the trial court to reimburse the ad litem for reasonable and necessary expenses and fees for his services. TEX.R. CIV. P. 173, 151–152 S.W.2d (Tex.Cases) xxxii. The determination of the amount of compensation awarded to an ad litem lies within the sound discretion of the trial court. *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 794 (Tex.1987). We will not overturn a fee award absent evidence showing an abuse of discretion. *Id.* A trial court abus-

---

**57.** Special questions 21 and 22 that submitted gross neglect to the jury were conditioned upon an affirmative answer to special question number 1, which did not include any negligence finding against Melendez. Consequently, under the jury's verdict and the court's judgment, Melendez has no liability for exemplary damages.

**58.** The Texas Supreme Court recently amended rule 173, and the amendments took effect on February 1, 2005, in "all pending cases." *See* TEX.R. CIV. P. 173 & cmts. Because rule 2 of the rules of civil procedure, titled "Scope of Rules," provides that "[t]hese rules shall govern the procedure in the justice, county, and district courts of the State of Texas in all actions of a civil nature," we construe the phrase "all pending cases" consistently with rule 2 to mean cases pending in those courts. *See* TEX.R. CIV. P. 2. Here, this case was not pending in the district court when the amendments to rule 173 took effect; on September 21, 2004, the trial court entered the "Second Modified Final Judgment," and Appellants timely perfected an appeal from that judgment on October 7, 2004. Thus, we apply the version of rule 173 that was in effect at the time of trial and when the judgment was entered. We note that although the amended rule does not change when a guardian ad litem should be appointed, it limits the guardian ad litem's participation in the litigation. *See* TEX.R. CIV. P. 173.6(d).

es its discretion by awarding ad litem fees if there is no evidence or insufficient evidence to support the award. *Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999) (per curiam). The burden is on the guardian ad litem, not the parties, to ensure that his services do not exceed the limited scope of a guardian ad litem's role in the litigation. *Goodyear Dunlop Tires N. Am., Ltd. v. Gamez,* 151 S.W.3d 574, 584 (Tex.App.-San Antonio 2004, no pet.).

### B. Application of Conflict of Interest Law to Facts

■ Here, Jagr was represented initially by his father Clint Royse as next friend. Appellees filed a motion to appoint a guardian ad litem for Jagr, and at the hearing on the motion when the trial court asked Appellees to identify the specific conflict that required a guardian ad litem, Appellees' attorney responded that Jagr needed a guardian ad litem to participate in trial to protect Jagr's interest and to handle any funds Jagr would receive in the event of a favorable verdict or settlement. The trial court granted Appellees' motion to appoint a guardian ad litem for Jagr.

Although Appellants' attorney correctly pointed out at that hearing that separate damage issues would be submitted for Jagr and for Jagr's next friend—his father—such a submission does not preclude the existence of a conflict of interest. *See Lumsden v. Chicago, R.I. & T. Ry. Co.,* 23 Tex.Civ.App. 137, 56 S.W. 605, 606 (1900, no writ) (holding that trial court erred by not appointing guardian ad litem to represent minor's interest where mother, who also acted as minor's next friend, received a larger portion of damages than minor); *see also McGough,* 842 S.W.2d at 640 (holding that trial court did not abuse its discretion by appointing guardian ad litem for minor where trial court expressed concerns that minor's managing conservators

had interests conflicting with those of minor; managing conservators would receive compensation for their services and had an interest in an inheritance should minor predecease them); *Missouri-Kansas-Texas R. Co. of Tex. v. Pluto,* 138 Tex. 1, 156 S.W.2d 265, 267 (1941) (holding that father who agreed to lump sum settlement for both his injuries and those of his son had interests conflicting with those of his son). Additionally, Jagr and his father, Clint, brought different claims against Appellants; Jagr brought claims for wrongful death of his mother and for his personal injuries, and Clint brought a claim for wrongful death of his wife. *See Bleeker v. Villarreal,* 941 S.W.2d 163, 170 (Tex.App.-Corpus Christi 1996, writ dism'd by agr.) (holding that trial court did not abuse its discretion by appointing guardians ad litem for minor plaintiffs when each of the thirteen plaintiffs brought different claims against defendant).

We have reviewed the record, and we hold that, contrary to Appellants' assertion, there is some evidence that a potential conflict of interest existed between Jagr and his next friend. *See Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). Consequently, we hold that the trial court did not abuse its discretion by appointing a guardian ad litem to represent Jagr's interests. *See, e.g., Bleeker,* 941 S.W.2d at 170.

### C. Application of Ad Litem's Fees to Facts

■ Regarding Appellants' complaint that "no competent evidence showed that all of [the ad litem's] time was necessitated by a conflict of interest," after trial, the court held a hearing regarding the ad litem's fees. At the hearing, the guardian ad litem introduced as Ad Litem's Exhibit 1 a letter detailing the time he had spent

on the case, including reviewing twenty-one depositions and two motions to compel, attending seven days of trial, preparing and reviewing daily transcripts, reviewing post-trial matters, and closing the file. The guardian ad litem requested $32,212.25 for his in-court and out-of-court time, for creating a trust for Jagr, and for any potential appellate work. The guardian ad litem also introduced as Ad Litem's Exhibit 2 his own affidavit explaining how he arrived at his hourly rate for in-court and out-of-court time and stating that his services were reasonable and necessary for his representation of Jagr. He stated in his affidavit that he "only attended hearings that were crucial to [Jagr] or necessary for trial." The guardian ad litem testified at the fee hearing that he had read the depositions listed in Ad Litem's Exhibit 1 immediately upon receiving the ad litem appointment in order to familiarize himself with the case, which was set for trial the following week. Appellants did not lodge any objections regarding the reasonableness of the fees either at or prior to the fee hearing. The trial court approved the requested fees and awarded $32,212.25 to the guardian ad litem.

The guardian ad litem did not attend every hearing and every deposition in this case; he testified that he reviewed depositions "to understand the facts of the case and be able to advise the Plaintiffs' Counsel and talk to them intelligently about any potential ... offers." *Cf. Goodyear Dunlop Tires N. Am., Ltd.*, 151 S.W.3d at 584 (holding trial court abused its discretion by awarding fees to ad litem for attending "virtually every hearing in the case" and every deposition, including those not relevant to the minor). He did not review discovery motions and depositions without regard to their relevance to the potential conflict of interest. *See Jocson v. Crabb*, 196 S.W.3d 302, 308 (Tex.App.-Houston [1st Dist.] 2006, no pet.). It was necessary

and appropriate for the guardian ad litem to review the live liability-related pleadings and discovery materials related to Jagr in order to evaluate the value of Jagr's claims and any potential settlement offers. *See Gamez*, 151 S.W.3d at 584.

Having reviewed the record, we hold that some evidence exists that the time billed by the ad litem was necessitated by a conflict of interest between Jagr and his next friend. *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118. Consequently, we hold that the trial court did not abuse its discretion by awarding the ad litem fees. *See Garcia*, 988 S.W.2d at 222.

We overrule Appellants' issue VI.

## XI. CONCLUSION

Having sustained Appellants' issue IV, subparts A, B, and C, we reverse the trial court judgment's award of $6,658,000 in exemplary damages against TXI ($3,329,-000 awarded to Clint Royse and $3,329,000 awarded to Jagr Royse) and render judgment that Clint Royse and Jagr Royse take nothing on their claims for exemplary damages. *See* TEX.R.APP. P. 43.3; *In re J.F.C.*, 96 S.W.3d at 266; *Vista Chevrolet, Inc.*, 709 S.W.2d at 176. Having sustained the portion of Appellants' issue III, subpart B that challenges the legal sufficiency of the evidence to support the jury's finding that Melendez negligently entrusted the gravel truck to Rodriguez, we reverse the portion of the trial court's judgment imposing liability on Melendez, and we render judgment that Appellees take nothing from him. Having overruled all of Appellants' other issues and the subparts of these issues as necessary for the disposition of this appeal, we affirm the remainder of the trial court's judgment.

GARDNER, J. filed a concurring and dissenting opinion.

ANNE GARDNER, Justice, concurring and dissenting.

I concur in the majority's reversal of the exemplary damages award; however, I respectfully dissent from the majority's affirmance of the judgment on Appellees' negligence claims.

## Introduction

It was undisputed that the Yukon crossed over into the gravel truck's own lane. It was undisputed that the Yukon struck the gravel truck in the gravel truck's own lane. The "gouge mark," which all experts agreed was made by impact of the Yukon with the gravel truck, was admittedly located in the gravel truck's own lane. And it was undisputed by all experts that the gouge mark in the gravel truck's lane was made by the Yukon, not the gravel truck. Yet in this suit for wrongful death and injuries to the driver and occupants of the Yukon, we have a verdict and judgment based on negligence of the gravel truck's driver, operator, and owner. How can that be?

Solely through testimony of their accident reconstruction expert, Dr. Kurt Marshek, Appellees espoused their theory that it was the gravel truck that somehow crossed over into the Yukon's lane first, which must have somehow caused the Yukon's driver, Kim Hughes, to respond defensively by veering the Yukon into the gravel truck's lane, that the gravel truck must have made a hard right back into its own lane to avoid the Yukon, and that the Yukon nevertheless then sideswiped the gravel truck—about a foot inside the gravel truck's lane—at the second axle of the rig, careened along the side of the trailer, struck its fourth axle, and then spun into the path of the F–250 pickup truck. The F–250 broadsided the Yukon, killing all but one occupant.

As the majority notes, it was the opinion of Appellees' expert, Dr. Marshek, based upon the angle of the two and one-half foot long gouge mark on the gravel truck's side of the road, that the gravel truck was returning to its lane of travel at the angle represented by the gouge mark when it was struck by the Yukon. Acknowledging that the gouge mark was made by the Yukon, not the gravel truck, Dr. Marshek attempted to show that the mark's angle reflected the angle of the gravel truck because the truck was the larger and more dominant force, so that the Yukon would have taken on the angle of the gravel truck as it collided with the truck. In his opinion, the gravel truck's angle of travel necessarily lined up with the angle of the gouge mark, which indicated to him that the truck was coming back from the wrong lane at the moment of impact.

Five eyewitnesses were in vehicles traveling in the vicinity of the accident, including the gravel truck driver, the driver of a vehicle that turned off the road a half mile in front of the gravel truck, and three occupants of two other vehicles traveling behind the gravel truck immediately before the collision. Not a single one of those witnesses saw the gravel truck in the wrong lane, as Dr. Marshek described. It is his testimony alone that places the gravel truck over in the Yukon's lane of travel. Dr. Marshek simply rejected the testimony of the four totally disinterested witnesses as well as the gravel truck driver, and Appellees unfairly discredited the gravel truck driver by improper and highly prejudicial proof that he was an illegal alien. For these reasons, among others, I would hold that this judgment cannot stand.

### Reliability of Dr. Marshek's Testimony

I disagree for at least three reasons with the majority's conclusion that Dr. Marshek's testimony meets the require-

ment of reliability for admissibility. First, there was no evidence Dr. Marshek followed any recognized protocol or methodology accepted in the field of accident reconstruction in making his assumptions or reaching his conclusions. Second, his conclusions were based upon critical assumptions unsupported by evidence. Third, his assumptions and conclusions varied materially from the physical evidence and testimony.

Dr. Marshek testified he used standard times for braking, steering reaction times, and speeds as recorded by the "black boxes" of the vehicles for the five seconds prior to impact to determine the pre-impact travel paths of the Yukon and gravel truck. But the record is devoid of evidence that Dr. Marshek conducted any calculations, tests, or methodology recognized in the field of accident reconstruction in assuming that the gouge mark was the point of first impact from which to measure his distances and determine the locations of the vehicles before impact. Likewise, Dr. Marshek cited no methodology or calculations for his conclusion that the gouge mark angle showed the angle of the gravel truck upon first impact, particularly since, as he acknowledged, the gouge mark was not made by the gravel truck but by the Yukon. Additionally, as Appellants' expert, John Painter, pointed out, Dr. Marshek did no calculations or testing on which to base his assumptions that the left front clearance pole fell off the truck as the result of deceleration rather than initial impact with the Yukon's side mirror, did no calculations or testing to determine the angles of the Yukon and gravel truck upon impact, and did no calculations or testing to reach his conclusion that the gravel truck could not have been in its own lane and ended up where it did.[1]

Appellants specifically complained in their brief that Dr. Marshek did no calculations to support his theory that the clearance pole was dislodged by the truck's deceleration or that the gravel truck could not have been in its own lane, and urged that his theory was shown to be "scientifically invalid" by Painter's computer simulation. Painter stated, "[i]n short, Dr. Marshek followed no protocol recognized by the science of accident reconstruction."[2] Therefore, the issue of the scientific reliability of Dr. Marshek's testimony was clearly properly preserved and raised on appeal. The majority opinion does not address Dr. Marshek's lack of methodology, testing, or techniques at all. The majority should have reached and ruled on this issue. Had it done so, it could only conclude Dr. Marshek's testimony was unreliable.

The very cases cited by the majority that demonstrate this state's "long history of allowing accident reconstruction experts to testify regarding how an accident occurred" also recognize that the expert must rely on and utilize principles recognized in that field. *See, e.g., Chavers v. State,* 991 S.W.2d 457, 461 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd) (noting

---

1. In contrast, Painter testified he used accepted protocol and a computer simulation program, developed for use in and widely accepted by the accident reconstruction community, to reach his opinions. Painter reconstructed the accident based upon all available data, including the data from the black boxes, photographs, measurements, and inspection of the vehicles, and concluded that the gravel truck did not cross the center line.

2. In their pretrial motion to exclude his testimony, Appellants also specifically preserved error, listing among other grounds that Dr. Marshek "does not follow the systematic procedures for analyzing collisions accepted by the accident reconstruction community" and "does not show that the techniques he used in this case are accepted by the accident reconstruction community."

importance of whether officer's testimony properly relies on and utilizes principles recognized in accident reconstruction); *Waring v. Wommack,* 945 S.W.2d 889, 893 (Tex.App.-Austin 1997, no writ) (observing that expert explained laws of physics supporting the tests he performed, referred to textbooks and literature that detailed his theory of accident reconstruction, and testified that his tests had nonjudicial uses); *N. Dallas Diagnostic Ctr. v. Dewberry,* 900 S.W.2d 90, 95 (Tex.App.-Dallas 1995, writ denied) (noting trial court must focus on validity of principles and methodology underlying testimony); *Thomson v. Rook,* 255 F.Supp.2d 584, 586–87 (E.D.Tex.2001) (allowing expert opinion based upon standard equations followed by accident reconstruction experts and standard rates of acceleration as reported in texts, but excluding expert opinion for which plaintiffs provided no evidence of articles, books, or other experts in automobile accident reconstruction field to validate methodology used to calculate delay in reaction time, causation, or proportion of responsibility).

As the supreme court recently reiterated, although the *Robinson* factors are not always useful in evaluating expert opinion in automobile accident cases, we must still turn to them initially for guidance. *Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 801 (Tex.2006) (analyzing reliability of expert opinion in light of six-factor test under *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995)). As to the first and third *Robinson* factors, the record here, as in *Cooper,* is devoid of any scientific testing or peer-reviewed articles to confirm Dr. Marshek's hypothesis that the gouge mark necessarily represented the point of impact of the vehicles or the path of the gravel truck returning from the wrong side of the road. *See id.; see also Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 912 (Tex.2004) (holding expert testimony in

auto accident case unreliable among other reasons because expert did not conduct tests or cite studies to support theory).

Likewise, Dr. Marshek's testimony does not meet the fourth, fifth, or sixth *Robinson* factors because he did no testing of his theory and cited no articles or studies to support his analysis and there was no proof that his underlying theory was based upon any methodology that had achieved general acceptance in the scientific community. *See Cooper,* 204 S.W.3d at 801. As to the fourth factor, the extent to which the methodology or technique relies on subjective interpretation of the expert, Dr. Marshek merely used an arbitrarily chosen initial impact site, i.e., a gouge mark, from which he then measured distances and theorized as to what action each driver may have taken that caused the collision. *See id.* (noting expert offered no testimony that either the scientific community or his own calculations had determined what amount of wax was required to cause a tire failure); *Ramirez,* 159 S.W.3d at 904 (noting expert failed to perform calculations in support of theory); *Robinson,* 923 S.W.2d at 559 (holding expert's testimony unreliable absent knowledge of what amount of contaminant would damage trees).

Expert testimony is not reliable "if there is too great an analytical gap between the data on which the expert relies and the opinion proffered." *Cooper,* 204 S.W.3d at 800 (citing *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 727 (Tex. 1998)); *see also Robinson,* 923 S.W.2d at 556 (concluding expert's testimony unreliable even when data is sound if conclusions drawn are based upon flawed methodology). In concluding their direct examination of Dr. Marshek, Appellees asked a few general housekeeping questions confirming generally that he had published articles on accident reconstruction, including critical speed analysis and lane change maneuvers,

and that his analysis was based on his "education, training, and experience, and reasonable engineering probability." However, as he provided no explanation as to what training, what education, what articles, what experience, or what engineering principles he relied upon, if any, in reaching his opinions in this case, those magic words are woefully insufficient. *See Cooper,* 204 S.W.3d at 806. Despite Dr. Marshek's qualifications, Appellees' failure to establish that he used any recognized methodology, testing, peer-reviewed articles, or principles accepted by the accident reconstruction community renders his expert testimony unreliable.

I also disagree with the majority's holding that Appellants' complaints are merely disagreements as to facts in dispute that go to the weight of the testimony. Factual support was totally lacking for Dr. Marshek's assumptions. Dr. Marshek testified that he relied only on the physical evidence of the single gouge mark and the skid marks of the gravel truck after it began braking and as it came to a stop on the right shoulder of the road, together with selected portions of the driver's statement. Dr. Marshek described no factual basis for his assumption that the gouge mark from which he calculated the distances was made by the bare rim of the front left wheel of the Yukon upon impact with the second axle of the truck.[3] Dr. Marshek never testified to any examination or description of either the left front or left rear wheel rims of the Yukon, both of which had blown-out tires. Additionally, the record reveals no factual support for Dr. Marshek's conclusion that the gouge was made by impact with the second axle rather than the fourth axle, which he agreed showed evidence of a more severe impact from the Yukon. Dr. Marshek agreed that it was possible that the gouge could have been made by impact with the fourth axle but rejected that possibility simply because it did not agree with his diagram.

Appellants' expert, John Painter, also pointed out that Dr. Marshek had no physical evidence to support his theory of the angles at which the vehicles collided and did no calculations on his theory that the gravel truck could not have been in its own lane and ended up where it did. Finally, Dr. Marshek was not designated as a human-factors expert and provided no opinion that the circumstances supported the probability that Kim Hughes engaged in a "fake-left" defensive maneuver to cause the Yukon to cross into the gravel truck's lane.[4]

Scientific testimony is unreliable if it amounts to no more than a subjective belief or unsupported speculation. *Cooper,* 204 S.W.3d at 800 (citing *Robinson,* 923 S.W.2d at 557). An expert's "bare opinion will not suffice. It is not so simply because 'an expert says it is so.'" *Volks-*

---

**3.** Dr. Marshek recalled that Lee Jackson, Appellees' former expert, believed that the gouge mark represented the initial point of impact. Jackson testified, however, that the initial point of impact was when the left side mirror of the Yukon hit the gravel truck's left front clearance pole, with the gouge mark showing the vehicles' maximum subsequent engagement.

**4.** Dr. Marshek said Kim Hughes would have seen the truck coming toward her in her lane and gone through the perception time at about 95 feet before impact, and that, based on the legal definition of "sudden emergency," Hughes acted reasonably in making her decision to veer into the gravel truck's path when she saw it coming toward her but, unfortunately, it turned back into its own lane. However, Hughes is deceased and no one knows what she saw, much less when or what decision, if any, she might have made. Dr. Marshek's testimony that she would have decided to veer directly into the wrong lane and into the path of the oncoming tractor-trailer rig is rank speculation.

*wagen of Am., Inc.*, 159 S.W.3d at 906. (quoting *Gammill*, 972 S.W.2d at 726). A claim will not stand on the mere *ipse dixit* of the expert alone. *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999). Dr. Marshek's theory that the gravel truck was on the wrong side of the road depended solely on factually unsupported assumptions as to how the gouge mark was made, that its angle reflected the position of the gravel truck, and that the Yukon thus crossed into the gravel truck's lane as a defensive maneuver. These assumptions were based on his own subjective interpretations and hypotheses of what might have happened and nothing more. For this additional reason, his opinions cannot pass the reliability test.

Moreover, Dr. Marshek disregarded evidence that conflicted with his theory, including evidence of damage to the clearance pole of the gravel truck, damage to the driver's side of the cab such as scrape marks with paint marks the color of the Yukon, and the existence of various other scrapes and marks on the pavement that were aligned at different angles. Dr. Marshek also acknowledged that the Yukon's left front wheel was "pushed ... straight back" by the force of the second axle of the gravel truck.[5] Dr. Marshek offered no explanation as to why a gouge mark made by the wheel rim as it was being pushed or driven back under the Yukon would not have differed from the trajectory of the body of that vehicle. And, contrary to the majority opinion, he did agree that there would have been some "restitution" or bounce as the Yukon struck the second axle, but stated that the amount was impossible for him to calculate.

Dr. Marshek's opinion that the gravel truck crossed into the Yukon's lane also varied materially from the contrary testimony of five occupants of the vehicles in the area of the collision. Ricardo Rodriguez, the driver of the gravel truck, consistently testified he was "100 percent sure" he never crossed the center line but, rather, the Yukon crossed the line and hit him. While Rodriguez was a party and Appellees attacked his credibility as discussed below, the other four persons were independent and disinterested witnesses. Jerry Larance, driver of the F–250 pickup truck that was only one-eighth of a mile behind the gravel truck and broadsided or "T-boned" the Yukon when it spun sideways in front of him after sideswiping the gravel truck, testified he recalled seeing every vehicle on the road and "if that truck would have been in the other lane, I would have seen that truck. I mean I wasn't sleeping driving down the road.... It [doesn't] take a rocket scientist to know that the truck was in its lane."

George Wilton, Larance's passenger in the pickup truck, testified that he was watching the gravel truck ahead of them and that it never left its lane. Moreover, he testified that he also saw the Yukon in its own lane before it got to the truck but that he could not see it strike the truck "for the truck," i.e., his view of the Yukon was blocked by the truck. Dr. Marshek theorized from this testimony that the truck moved into the wrong lane, blocking Wilton's vision, but an equal inference is that the Yukon moved into the truck's lane so as to be hidden from Wilton's sight. Therefore, that he could not see the Yukon when it struck the truck is no evidence that the truck was in the wrong lane.

Cody Jobe, who had turned into a driveway a half mile in front of the gravel truck,

---

**5.** Physical inspection of the Yukon showed that the wheel, including the rim, was actually sheared off by the impact.

testified that he glanced in his rearview mirror and noticed the gravel truck driving properly in its own lane. He likewise did not see the gravel truck doing anything wrong. Michelle Windham, who was hurrying in an attempt to pass Larance's pickup truck immediately before the accident, testified she was looking ahead into the oncoming traffic and that she would have noticed if the gravel truck had swerved into the opposite lane but that she never saw it do so. Dr. Marshek rejected the descriptions of these witnesses because, in his opinion, they either were not looking at the truck or did not see it at the critical moment.

Dr. Marshek used Rodriguez's statement that he steered "hard" right for one, two, or three seconds before the collision to support Dr. Marshek's theory that the gravel truck had to be returning from the Yukon's lane to end up at the gouge mark as the initial point of impact. Dr. Marshek explained that how hard someone steered to the right to move a certain distance in that direction could be "measured" different ways, either by the steering wheel or the angle of the front tires, or in terms of the "G" rate. At a "given" G rate and a given speed, he could determine how far to the right the gravel truck would have moved in one, two, or three seconds. Using a G rate of .32, and if the gravel truck had been in its own lane when Rodriguez began turning, the gravel truck would have missed the impact point by six feet. Therefore, he concluded, the gravel truck must have started turning right from the other lane in order to end up at the impact point in the time Rodriguez testified he was turning the rig to the right. The problem with that theory is that no one knows when or how hard Rodriguez steered to the right.

As even Dr. Marshek admitted on cross-examination, "nobody knows what the braking was. Nobody knows what the steering was. Nobody knows what the steering was for the—for the rock truck, so how can you put steering inputs into something you know nothing about; it's all total speculation." Interestingly, using Dr. Marshek's calculations, if an eighteen-wheeler tractor-trailer rig, loaded with rocks and weighing 84,000 pounds, managed to veer into the left lane and then return to the right lane within a span of three seconds without a rollover, such a remarkable maneuver surely would have been observed by at least one of the occupants in the vehicles in front of or behind it.[6]

Dr. Marshek acknowledged it was also possible that the gouge mark was made by the rim of the Yukon's left rear tire connecting with the gravel truck's fourth axle, which he agreed sustained greater damage than the second axle. But in his opinion that was impossible because that impact did not make a gouge. In other words, he rejected that possibility simply because it conflicted with his own theory. Dr. Marshek even admitted on cross-examination that the two-and-a-half-foot-long gouge mark could not have been made at the instant of initial impact because it would have taken about one eighth of a second for the tire damage to expose the bare rim that made the gouge, during which time the Yukon would have traveled eleven feet.

"When an expert's opinion is based on assumed facts that vary materially from

---

**6.** Dr. Marshek himself rejected the possibility that the gravel truck turned right to avoid the collision from its own lane, because it would have had to perform a right and then an immediate and quick-left maneuver in order to line up with skid marks made by the trailer, which would have been very difficult for a fully loaded truck to manage without rollover or spillage, of which there was no evidence.

the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). Because Dr. Marshek's opinions varied materially from the undisputed testimony from all eyewitnesses and the physical evidence, his testimony was unreliable.

I would hold that the trial court abused its discretion in admitting his opinions for all three of the reasons discussed above. Dr. Marshek was the only witness who testified that the gravel truck crossed over the center line into the wrong lane. Because his testimony is unreliable, it was inadmissable, and there is legally insufficient evidence to support Appellees' claim that the truck driver was negligent and proximately caused the occurrence in question. Therefore, I would reverse and render judgment in favor of Appellants.

## The Truck Driver's Immigration Status

After eliminating all Hispanics from the jury panel, Appellees sought from the beginning of trial to impress the jury with the fact that Ricardo Reyna Rodriguez, the gravel truck driver, was an illegal Mexican alien. Appellees' very first witness was Rodriguez, whom they put on as an adverse witness through his video deposition. Counsel for Appellees asked him if he would prefer to be questioned in English or Spanish, and proceeded to interrogate him with questions about his years of driving experience in Mexico and his illegality as an immigrant in the United States, both past and present.

Appellees' counsel did not mention, much less did they emphasize, Rodriguez's illegal status in closing argument. They did not need to. Trial lawyers learn early that the most vital impressions on a jury are made in the first few moments of a trial. Moreover, they made sure the jury

did not forget. Throughout the trial, at least forty references to Rodriguez's status as an illegal alien were made, through questioning of Rodriguez as well as other witnesses, reminding the jurors of Rodriguez's prior residence, his driving experience, and his years as a driver in Mexico, his prior arrest for illegal entry and deportation to Mexico, his use of a false social security number to obtain his commercial Texas driver's license in 1996, his making of false statements to prospective employers regarding his immigration status, and even his current status as an immigrant while continuing to drive for TXI. Additionally, although not noted by the majority, Appellants complain that Appellees were allowed to introduce evidence of Rodriguez's conviction under 8 U.S.C. § 1325(a)(3) for illegal entry into the United States.

Whether Rodriguez was an illegal immigrant had nothing to do with whether he crossed over the center line of Highway 114 before the collision. His immigration status was equally irrelevant on the issues of his driving experience, which was considerable, and his driving record, which was clean, in connection with Appellees' negligent entrustment and negligent hiring claims. Appellants tied this evidence to Rodriguez's use of a false social security number to obtain his commercial driver's license in Texas. But whether he had a false social security number was likewise irrelevant. Indeed, the majority agrees that neither Rodriguez's status as an illegal alien nor his use of a fake social security number to obtain a commercial driver's license created a risk foreseeable to TXI that he would negligently drive the gravel truck, and this evidence therefore had no causal nexus to the negligence finding against it.

Appellees sought to use Rodriguez's illegal immigration status as well as his prior

conviction and deportation, his false statements to prospective employers, and his use of a false social security number solely to impeach his credibility. The majority agrees that this evidence was inadmissible for impeachment because it constituted specific instances of misconduct, the use of which is prohibited under Texas Rule of Evidence 608(b). But the majority holds that this evidence was nevertheless somehow admissible as admissions of a party under rule 801(e)(2)(A). I disagree. *See* Tex.R. Evid. 801. The specific section cited by the majority defines admissions of a party opponent. *See* Tex.R. Evid. 801(e)(2)(A). None of the evidence offered consisted of prior admissions by Rodriguez that were inconsistent with any of his trial testimony. Appellees obviously and expressly offered this evidence to show specific instances of conduct for the purpose of impeaching of Rodriguez's credibility because he was the most critical eyewitness to the accident. The evidence was clearly inadmissible under rule 608(b).

The only exception to the rule disallowing evidence of specific instances of conduct for impeachment is evidence of conviction of a crime as provided by rule 609. That rule allows evidence of a commission of a crime for impeachment only if the conviction is not more than ten years old, the crime is a felony or involves moral turpitude, and the trial court finds that the probative value outweighs its prejudicial effect. Tex.R. Evid. 609(a). Rodriguez's conviction was for a misdemeanor, not a felony. *See* 8 U.S.C.A. § 1325(a) (2000) (reciting punishment of six months in jail for first conviction). Appellees have not argued otherwise on appeal, nor do they argue that his illegal entry into the United States was a crime of moral turpitude. Therefore, the evidence of his conviction was inadmissible under rule 608(b).

Additionally, the attempted impeachment was on a matter totally collateral to any issue at trial and was therefore improperly allowed for that further reason. It is well settled that impeachment on a collateral matter is improper. Statements made by a witness pertaining to collateral matters may not be used to impeach him. *Penwell v. Barrett,* 724 S.W.2d 902, 906–07 (Tex.App.-San Antonio 1987, no writ); *Chagas v. West Bros. Inc.,* 589 S.W.2d 185, 186–87 (Tex.Civ.App.-Fort Worth 1979, no writ); *Spiritas v. Robinowitz,* 544 S.W.2d 710, 721–22 (Tex.Civ.App.-Dallas 1976, writ ref'd n.r.e.); *Christie v. Brewer,* 374 S.W.2d 908, 913–14 (Tex.Civ.App.-Austin 1964, writ ref'd n.r.e.). For all these reasons, the trial court abused its discretion by admitting the evidence in question.

The trial court's abuse of discretion in admitting all of the evidence regarding Rodriguez's illegal-alien status was clearly harmful. Racial and ethnic distinctions of any sort "are inherently suspect and thus call for the most exacting judicial examination." *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978). "[D]iscrimination on the basis of race, odious in all respects, is especially pernicious in the administration of justice." *United States v. Doe,* 903 F.2d 16, 21 (D.C.Cir.1990) (stating "[b]ecause of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system.") (citing *McCleskey v. Kemp,* 481 U.S. 279, 309, 107 S.Ct. 1756, 1788, 95 L.Ed.2d 262 (1987)). Distinctions based on ancestry "are as odious and suspect" as those based on race because they threaten the fairness of the trial. *Id.* at 21–22. Injection of ethnicity into a trial clearly invites the jury to put the defendant's racial and cultural background into the balance in determining defendant's guilt.

*United States v. Vue*, 13 F.3d 1206, 1211 (8th Cir.1994).

As the majority opinion demonstrates, Appellees did not even need to show Rodriguez's status as an illegal alien to impeach him. The evidence that he had invented a social security number and made misrepresentations to prospective employers about dates of prior employment could have been used without going into his immigration status. The repeated injection into the case of Rodriguez's nationality, ethnicity, and illegal-immigrant status, including his conviction and deportation, was plainly calculated to inflame the jury against him. *See id.* This error is "a serious trespass" because equality before the law is and must be defended, regardless of personal sentiment, as the bedrock of our judicial system. *See id.*

Texas courts have long held that references to race or national origin of a defendant are inappropriate, particularly in light of "signs of the times." *See Marx v. State*, 141 Tex.Crim. 628, 150 S.W.2d 1014, 1016–1017 (1941). The signs of the times with respect to illegal Mexican immigrants have never been worse. Emphasizing Rodriguez's illegal status is tantamount to demonization to many in this social and political climate. The issue is highly volatile, emotional, and inflammatory as debate about this issue escalates in this post–9–11 era with heightened fears, among others, about taking jobs from citizens, border crime, drugs, and even terrorism. Reference to the immigration status of an illegal alien was long ago held to be *so prejudicial on its face that the harm is incurable*. *See, e.g., Penate v. Berry*, 348 S.W.2d 167, 168 (Tex.Civ.App.-El Paso 1961, writ ref'd

n.r.e.) (reversing judgment based on prejudice from jury argument emphasizing Mexican defendant's status as illegal alien).

Even if one accepts that Appellees were entitled to impeach Rodriguez's credibility as the only eyewitness who knew for certain whether he crossed over into the other lane, and even going one step further and assuming that Rodriguez's status as an illegal alien was somehow admissible, I cannot see how the substantial prejudice created by the highly inflammatory nature of the evidence did not greatly outweigh any probative value. *See* Tex.R. Evid. 609(a). I believe it probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a).

**Negligent Hiring**

I also disagree with the majority's holding that the trial court did not omit an essential element of Appellees' negligent hiring claim against TXI, i.e., the requirement that TXI knew or should have known that Rodriguez was an incompetent driver. I am mystified as to how the majority concludes that, merely by including TXI in the general liability question along with the general negligence, proximate cause, and ordinary care instructions, the disputed issue—whether TXI knew or should have known that Rodriguez was an incompetent driver—was adequately placed before the jury when that element was completely absent from the instructions.

The basis for direct liability of the employer is its own negligence in hiring, retaining, or supervising an employee that it knows or reasonably should know is incompetent or unfit.[7] In holding that the trial

---

7. *See, e.g., Garrett v.Great W. Distrib. Co.*, 129 S.W.3d 797, 803–04 (Tex.App.-Amarillo 2004, pet. denied) (holding basis for direct liability of employer lay in its own negligence in failing to supervise employee when it knew or

should have known of employee's incompetence); *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 495 (Tex.App.-Fort Worth 2002, no pet.) (holding fact issue raised regarding whether employer knew or should have

court was not required to submit the essential knew-or-should-have-known-employee-was-incompetent element, I believe the majority opinion conflicts with the very cases it cites for the opposite proposition, including this court's prior decision of *Morris v. JTM Materials, Inc.,* 78 S.W.3d 28, 49 (Tex.App.-Fort Worth 2002, no pet.) (holding whether employer knew or should have known employee was incompetent or unfit driver is essential element of negligent hiring claim). And I cannot agree with the majority's effort to distinguish *Builders Transp., Inc. v. Grice–Smith,* 167 S.W.3d 1, 8–9 (Tex.App.-Waco 2005, no pet.) (reversing judgment because jury question omitted essential element of whether employer knew or should have known employee was incompetent driver), *judgm't withdrawn and superseded on reh'g,* 167 S.W.3d 18 (Tex.App.-Waco 2005, pet. filed). The Waco Court in that case held that whether the employer knew or should have known that the employee was incompetent was, indeed, an essential element of the negligent hiring claim but not an essential element for a separate claim for negligent "training." 167 S.W.3d at 8–9.

Finally, I part ways with the majority with respect to its holding that the omitted element should be deemed found in favor of the verdict because TXI failed to request submission of the omitted element or to object to the omission. As the majority, itself, acknowledges, TXI did request submission of special question number 5 with instructions specifically including the miss-

ing element, and the trial court signed off on its refusal.

Contrary to the majority's interpretation of TXI's counsel's comment that they were "not all that desirous" of having the requested question and accompanying instructions submitted, I do not believe that the comment was a withdrawal of the request but, rather, merely an understandable sidebar remark in the upside-down context of broad-form submission, i.e., that our existing rules require any party to request instructions to include any and all omitted elements of its opponent's theory of recovery or defense, even though the party seeking to preserve error has neither the burden of proof on nor the burden to request submission of the question, itself. *See* Tex.R. Civ. P. 278 (providing failure to submit a definition or instruction shall not be deemed ground for reversal unless substantially correct definition or instruction has been requested in writing and tendered by party seeking reversal).

A finding on the knew-or-should-have-known-employee-incompetent element cannot be deemed in favor of the verdict and judgment because TXI properly objected by requesting submission of the negligent hiring theory with the omitted element included. *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) (holding separate objection not required where, by requested question, party made trial court aware of complaint timely and clearly, and obtained ruling on request); *see also First Valley Bank of Los Fresnos v. Martin,* 144 S.W.3d 466, 474 (Tex.2004) (Wainwright, J., concur-

known employee was incompetent or unfit); *Verinakis v. Med. Profiles, Inc.,* 987 S.W.2d 90, 97 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) (holding employer who negligently hires incompetent or unfit employee may be liable to third party for negligence of employee); *see also CoTemp, Inc. v. Houston West Corp.,* 222 S.W.3d 487, 491 (Tex.App.-

Houston [14th Dist.] 2007, no pet.) (plurality opinion) (explaining basis of responsibility for negligent hiring, retention, or supervision premised on duty created by foreseeability of unreasonable risk to others by employer who knows or should know employee is incompetent or unfit).

ring) (noting that, under *Payne*, a request may serve as an objection for preservation of error purposes as long as trial court is aware of complaint and issues a ruling). Under *Payne*, error was not waived regarding the omitted element because TXI made the trial court plainly aware of its complaint and obtained a ruling.

## Conclusion

I dissent. I would reverse and render judgment in favor of Appellants on Appellees' negligence claims because the expert testimony of their expert witness was unreliable. Alternatively, while I concur in that portion of the majority opinion setting aside the award of punitive damages, I would remand the remainder of the cause with respect to negligence and compensatory damages for new trial because of the abuse of discretion in permitting evidence of Rodriguez's status as an illegal alien.

In addition, in the event this case were remanded, I would hold that the trial court abused its discretion in excluding, and on retrial should admit into evidence, the complete DPS report and the findings and opinions that Trooper Raney made in that report that Rodriguez, as the driver of the gravel truck, took "correct evasive action" to the southbound shoulder of the road, that the point of impact was the gravel truck's left front clearance marker, and that Kim Hughes drove the Yukon into the lane of travel of the gravel truck for "unknown reasons" or that the collision may have happened because of a blowout of one of the Yukon's tires.